**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

James Soto (N30315),            )
                                           )
                   Petitioner,       )
                                           )      Case No. 96 C 5680
            v.                )
                                           )      Hon. Thomas M. Durkin
                                           )
Charles Truitt, Warden,        )
Stateville Correctional Center,    )
                                           )
                  Respondent.    )

**MEMORANDUM OPINION AND ORDER**

Petitioner James Soto, a prisoner at the Stateville Correctional Center, brings a counseled second amended habeas corpus petition pursuant to 28 U.S.C. § 2254 challenging his murder and attempted murder convictions from the Circuit Court of Cook County, Illinois. (Dkt. 158.) For the reasons explained below, the Court denies the petition on the merits. The Court grants a certificate of appealability as to Claim 1(a) on the single issue of whether there is clearly established federal law from the Supreme Court of the United States holding that a trial court's failure to give a freestanding jury instruction explaining that the prosecution's burden of proof is beyond a reasonable doubt results in a structural error when the trial court instructed the jurors on the beyond a reasonable doubt standard during *voir dire*, and when the standard is referenced in other jury instructions. The Court declines to issue a certificate of appealability on any other claim.

**BACKGROUND**[1]

**I.      Petitioner's Trial**

Petitioner, David Ayala, Ruben Palomo, and Wally Cruz were charged with murder, attempted murder, and conspiracy following a shooting in Pietrowski Park, Chicago, Illinois, on

---

[1] The following facts are drawn from the state court record (Dkt. 71), the state appellate court's decision on direct

August 16, 1981, that resulted in the death of Julie Limas, a sixteen-year-old high school student, and Hector Valeriano, a United States Marine home on leave. *People v. Ayala*, 491 N.E.2d 154, 155-56 (Ill. App. Ct. 1986) ("*Direct Appeal*"). A third victim, Juan Padilla, a member of the Latin Kings street gang, was injured by a gunshot wound to his back. *Id.*

Cruz accepted a plea deal whereby the State agreed to *nolle pros* the murder charges and recommend a five-year sentence for conspiracy in exchange for his testimony. *Id.* at 156. Petitioner and Ayala were tried jointly by a single jury. *People v. Soto*, 2013 IL App (1st) 100863-U, ¶ 3 ("*2013 Post-Conviction Appeal*"). Palomo was tried simultaneously with Petitioner and Ayala, but before a separate jury. *Id.*

During *voir dire*, the trial court admonished the jury venire on the presumption of innocence and the State's burden of proof of beyond a reasonable doubt, and questioned prospective jurors about their obligation if the State did not satisfy its burden. *Direct Appeal*, 491 N.E.2d at 157. Petitioner's counsel further emphasized the importance of these principles during his opening statement. (Dkt. 71-19, pg. 727-28.)

The State presented Cruz as its main witness, who testified as to the events leading up to the murders at Pietrowski Park. *Direct Appeal*, 491 N.E.2d at 156. Cruz testified that he, Petitioner, Ayala, and Palomo were members of the 26 Boys street gang. *Id.* On the day of the murders, a meeting of the 26 Boys was held in Ayala's basement to discuss "making hits" on a rival gang, the

---

appeal, *People v. Ayala*, 491 N.E.2d 154 (Ill. App. Ct. 1986), and the state appellate court's decisions in post-conviction proceedings. (Dkt. 71-10, pg. 46-54) (*People v. Soto*, No. 1-91-4024 (Ill. App. Ct. Feb. 16, 1993)); *People v. Soto*, 2013 IL App (1st) 100863-U. The state court's factual findings are presumed correct unless Petitioner rebuts this presumption by clear and convincing evidence. *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562 (7th Cir. 2018)); *see also Ward v. Hinsley*, 377 F.3d 719, 721 (7th Cir. 2004) ("[W]e presume the state court's recitation of the facts to be correct.").

Latin Kings. *Id.* Petitioner was present in Ayala's home during the meeting, but was upstairs when the discussion of the Latin Kings took place. *Id.*

Cruz explained that later that evening, Ayala received a phone call from Lisa Suarez who informed him that members of the Latin Kings were at Pietrowski Park. *Id.* Ayala then handed out weapons, providing Petitioner with a handgun and Palomo with a rifle. *Id.*; (Dkt. 71-20, pg. 33-36.) Cruz testified that he got the keys to Ayala's dark blue minivan and drove Petitioner and Palomo to Pietrowski Park. *Direct Appeal*, 491 N.E.2d at 156; (Dkt. 71-20, pg. 32-33, 36-37, 123.)

According to Cruz, a large group of people were in the park when the assailants arrived. *Direct Appeal*, 491 N.E.2d at 156. As Cruz circled around, they saw Suarez and Isabel Gomez ("Chave") who confirmed the Latin Kings were still at the park. *Id.*; (Dkt. 71-20, pg. 37-39.) Palomo told the girls that they would take care of things and to go home. *Direct Appeal*, 491 N.E.2d at 156. Cruz then drove down an alley and parked the van. *Id.* Petitioner and Palomo exited the vehicle carrying their weapons, while Cruz stayed behind. *Id.* Cruz heard gunshots and was told by Petitioner and Palomo upon their return that someone might have been hit. *Id.* The three fled to Ayala's house where Ayala received a phone call informing him that two people had been murdered and one wounded. *Id.* During cross-examination, Cruz acknowledged and provided extensive testimony regarding his cooperation agreement with the State. (Dkt. 71-20, pg. 139-63.)

The State also called John Orozco, Hugo Flores, and Juan Padilla, all of whom were at the park on the night of the murders, as witnesses. *Id.* at 261, 294-95, 336-37. Orozco testified that he observed a dark blue minivan that he recognized as a "26 van" pass by the park. *Id.* at 271-73. Shortly after, the gunfire erupted. *Id.* at 273-74. Orozco could not see who was firing the gunshots,

but explained that the gunfire was coming from Keeler Avenue.[2] *Id.* at 274. Flores similarly testified that he could not see the faces of the shooters, but observed that one was holding a rifle and the other was firing a handgun. *Id.* at 299, 321-22. Padilla testified that he dropped to the ground when he heard the gunshots and tried to crawl away. *Id.* at 343. In his attempt to escape, Padilla was hit by a bullet in the lower back. *Id.* at 343-44. He did not see who was firing the shots. *Id.* at 343. Padilla's trial testimony was consistent with a statement he gave to police shortly after the murders. (Dkt. 71-12, pg. 34.)

In his defense, Petitioner called several witnesses to question the reliability of Cruz's testimony regarding the gang meeting at Ayala's house. Lisa Menchetti, a juvenile court clerk in the Circuit Court of Cook County, testified that Alejandro Valle, one of the individuals Cruz alleged was present at the gang meeting, was in custody at the juvenile detention center at the time. (Dkt. 71-6, pg. 15-17.) Robert Villagomez explained he was in the hospital and not at Ayala's home on the day of the shootings. *Id.* at 123-26. Similarly, Javier Jacquez said he was at home with his parents and sister. *Id.* at 136. Defense witnesses Alisa Orozco and Carol Chapa also testified that Cruz told them he lied about Petitioner and Ayala's involvement in the murders at the grand jury proceedings *Id.* at 41, 69.

During closing argument, Petitioner's counsel reiterated the significance of the presumption of innocence and beyond a reasonable doubt standards. *Direct Appeal*, 491 N.E.2d at 157. Before deliberations, the trial court instructed the jurors on the elements of each crime charged and informed them that the State must prove all of the elements beyond a reasonable doubt. (Dkt. 71-6, pg. 560, 562, 566-57). The jury, however, did not receive a standalone burden of proof and

---

2  A map of Pietrowski Park is available at: *https://www.google.com/maps/search/Pietrowski+Park,+Chicago,+Illinois*.

presumption of innocence instruction. *Direct Appeal*, 491 N.E.2d at 156. Nor were the jurors instructed on accomplice-witness testimony, as Petitioner's counsel did not request the jury instruction be given. *2013 Post-Conviction Appeal*, ¶ 28.

The jury convicted Petitioner of two counts of first-degree murder, attempted murder, and conspiracy. *Id.* at ¶ 3. He was sentenced to concurrent prison terms of mandatory life imprisonment for his murder convictions, 30 years for attempted murder, and seven years for conspiracy. *Id.*

## II. Petitioner's Direct Appeal

Petitioner and Ayala filed a consolidated direct appeal, arguing the trial court erred by: (1) failing to give the formal jury instruction on the presumption of innocence and burden of proof; (2) granting Cruz's motion for substitution of judge; and (3) imposing natural life sentences.[3] *Direct Appeal*, 491 N.E.2d at 155. The appellate court rejected their claims and affirmed their convictions and sentences. *Id.* at 159. Petitioner then petitioned the Supreme Court of Illinois for leave to appeal (PLA), but raised only the first issue. (Dkt. 71-3, pg. 8-29.) The Supreme Court of Illinois denied his PLA. (Dkt. 71-3, pg. 41) (*People v. Ayala*, No. 63-444 (Ill. October 2, 1986)).

## III. Petitioner's Post-Conviction Proceedings

In light of the complexity of Petitioner's post-conviction filings, the Court summarizes the procedural history of these proceedings up to the Appellate Court of Illinois' 2013 ruling on post-conviction appeal and the Supreme Court of Illinois' subsequent rejection of Petitioner's post-conviction PLA as follows:

- August 1991: Petitioner filed his first *pro se* post-conviction petition, raising various claims of ineffective assistance of counsel and due process violations, including the failure to instruct the jury on the presumption of

---

3  The briefs from the 1986 direct appeal were not filed with this Court. (Dkt. 71.) According to Respondent, "[n]either party has been able to obtain the briefs from Petitioner's decades-old direct appeal…" (Dkt. 172, pg. 10.) The claims listed in this opinion are those that were adjudicated by the state appellate court on direct appeal.

innocence and the State's burden of proof, and trial counsel's failure to request a jury instruction on accomplice-witness testimony. (Dkt. 71-12, pg. 7-50.) He further argued appellate counsel was ineffective for failing to raise these, and other, meritorious issues on direct appeal. *Id.* The trial court summarily dismissed his petition. *Id.* at 51.

- October 1991: Petitioner filed a motion to reconsider and supplemental *pro se* post-conviction petition alleging there was insufficient evidence to prove his guilt beyond a reasonable doubt and the State knowingly used perjured testimony from Cruz to secure his conviction. *Id.* at 53-98. Petitioner attached several affidavits in support of his petition, including the affidavit of Padilla who averred the State pressured him into testifying that he could not see the shooters' faces. *Id.* at 81-87. The trial court denied his motion to reconsider and summarily dismissed his supplemental petition. *Id.* at 99-100.

- February 1993: Petitioner appealed the trial court's dismissal, raising only the issues of knowing use of perjured testimony and ineffective assistance of appellate counsel for failing to argue the guilty verdicts for conspiracy to commit murder and murder were inconsistent. (Dkt. 71-4, pg. 22-27.) The Appellate Court of Illinois rejected his ineffective assistance claim, but vacated his conspiracy conviction. (Dkt. 71-10, pg. 46-54) (*People v. Soto*, No. 1-91-4024 (Ill. Appt. Ct. Feb 16, 1993)). The appellate court did not remand this issue for resentencing because of Petitioner's natural life sentence for murder. *Id.* The court did, however, reverse and remand the matter for further proceedings on the ground that the allegations contained in Padilla's affidavit met the threshold of presenting the gist of a meritorious constitutional claim under Illinois' Post-Conviction Hearing Act. *Id.*; *see* 725 ILCS 5/122-2.1.

- April 1993–March 1998: Prior to the Illinois' Office of the State Appellate Defender's appointment following the remand, Petitioner filed a second supplemental *pro se* post-conviction petition, raising the same issues he previously raised in his original *pro se* post-conviction petition. (Dkt. 71-10, pg. 27-45; Dkt. 71-16, pg. 177.) The State filed a motion to dismiss. (Dkt. 71-10, pg. 56-61.) Petitioner did not respond to the motion, and it remained pending for several years. (Dkt. 71-16, pg. 177-78.) In 1996, Petitioner retained a private attorney. (Dkt. 71-10, pg. 62-64.) In 1998, the trial court converted a status date into a hearing on the State's motion to dismiss and granted the motion without Petitioner's counsel present. (Dkt. 71-4, pg. 20; Dkt. 71-9, pg. 42-43.) Following the trial court's dismissal, Petitioner filed a motion to reconsider, and two exhaustive amended *pro se* post-conviction petitions sometime between February and March 1998.

6

(Dkt. 71-15, pg. 15-156; Dkt. 71-16, pg. 177); *see also 2013 Post-Conviction Appeal*, ¶¶ 11-12.

- June 2000: The Appellate Court of Illinois later vacated the trial court's order of dismissal upon the State's confession of error that the motion was granted without counsel present. (Dkt. 71-7, pg. 1) (*People v. Soto,* No. 1–98–1313 (June 14, 2000)). The matter was remanded for further proceedings under Illinois' Post-Conviction Hearing Act. *Id.*

- May 2003–February 2010: The State filed a motion to dismiss Petitioner's March 1998 amended petition, arguing that it failed to raise any cognizable claims, the claims were conclusory, and his petition was untimely and successive. (Dkt. 71-15, pg. 9-11.) The matter was continued multiple times from May 2003 through December 2009. (Dkt. 71-16, pg. 53-132.) During that time, Petitioner's then-acting counsel, who had been appointed from the Illinois' Office of the State Appellate Defender, filed an Illinois Supreme Court Rule 651(c) certification, stating that no amendments to Petitioner's *pro se* petition were necessary. (Dkt. 71-13, pg. 21.) In May 2009, the State filed a second motion to dismiss, arguing the only surviving claim from Petitioner's original *pro se* petition was the Padilla-perjury claim which did not establish a substantial showing of a constitutional violation as required under the Illinois Post-Conviction Hearing Act. *Id.* at 19-35. The post-conviction trial court granted the motion to dismiss on February 18, 2010. *Id.* at 47. (Dkt. 71-16, pg. 156-75.)

Petitioner, through his appellate defender, appealed the trial court's 2010 order of dismissal of his 1998 amended post-conviction petition, raising three claims: (1) the State intimidated Padilla to secure false testimony; (2) Petitioner's trial and appellate counsel were ineffective in failing to request the jury instruction on accomplice-witness testimony; and (3) Petitioner's appointed post-conviction counsel did not provide reasonable assistance for: (a) failing to amend his *pro se* post-conviction petition to include supporting affidavits, (b) failing to include a claim of ineffective assistance of trial counsel, and (c) failing to make key arguments at the hearing on the motion to dismiss. (Dkt. 71-2, pg. 1-47.) The post-conviction appellate court denied Petitioner's claims and affirmed the trial court's dismissal. *2013 Post-Conviction Appeal*, ¶¶ 46-47.

7

Thereafter, Petitioner filed a counseled PLA in the Supreme Court of Illinois, arguing: (1) Petitioner's Padilla-false-testimony claim was rejected on improper credibility grounds; and (2) the appellate court erroneously allowed the partial summary dismissal of Petitioner's post-conviction petition. (Dkt. 71-1, pg. 9-26.) The Supreme Court of Illinois denied Petitioner's PLA. *People v. Soto*, 996 N.E.2d 21 (Table) (Ill. 2013).

## IV.    Habeas Proceedings

While his post-conviction proceedings were pending in state court, Petitioner filed a *pro se* petition for writ of habeas corpus in this Court before the Honorable David H. Coar on September 6, 1996.[4] (Dkt. 1.) The petition raised seven grounds for relief: (1) the trial court failed to formally instruct the jury regarding the presumption of innocence and burden of proof standards; (2) the State failed to prove guilt beyond a reasonable doubt; (3) the State knowingly used perjured testimony; (4) prosecutorial misconduct; (5) juror bias; (6) ineffective assistance of trial and appellate counsel for failing to make timely objections, failing to call key exonerating witnesses, failing to request certain jury instructions, failing to properly analyze the case and explain Petitioner's right to testify, and failing to raise meritorious claims on direct appeal; and (7) the trial court failed to consider all mitigating factors during sentencing. *Id.* at pg. 5-12.

On September 11, 1997, Judge Coar entered an order dismissing the petition without prejudice to allow Petitioner to exhaust his state court remedies with leave to file a motion for reinstatement within 60 days after disposition of the same. (Dkt. 15.) Petitioner sought reconsideration of the dismissal, (Dkt. 18), and Judge Coar reinstated the initial petition on August 7, 1998. (Dkt. 22.)

---

4 As this case was filed after the Antiterrorism and Effective Death Penalty Act's (AEDPA) April 24, 1996, effective date, the AEDPA applies to this case. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

On April 25, 2001, Judge Coar entered an order denying Petitioner's habeas corpus petition on the merits except with respect to the claim regarding prosecutorial misconduct related to Padilla's affidavit. (Dkt. 43.) Judge Coar noted this issue remained pending before the Appellate Court of Illinois and dismissed the claim without prejudice. *Id.*

On May 10, 2001, Respondent filed a motion to reconsider, requesting Judge Coar vacate the portion of the April 25th Memorandum Opinion and Order allowing Petitioner to reinstate the claim related to Padilla's affidavit upon being addressed by the state appellate court. (Dkt. 46.) Petitioner responded to the motion, contending that he should have been afforded the opportunity to either strike the unexhausted claims in his habeas corpus petition and proceed or, alternatively, resubmit his petition once all claims were exhausted. (Dkt. 48.) Judge Coar agreed with Petitioner's position, vacated the April 25th decision, and dismissed the entire habeas corpus petition without prejudice with leave to reinstate within 60 days after the final appeal in the state court system. (Dkt. 49.)

On November 18, 2013, Petitioner filed a motion to stay proceedings following the Supreme Court of Illinois' denial of his PLA on September 25, 2013. (Dkt. 51.) Judge Coar had retired during the intervening period resulting in the reassignment of the case to the undersigned Judge. (Dkt. 52.) The Court granted Petitioner's motion to the extent it requested reinstatement of the proceedings and reserved ruling on the request to stay. (Dkt. 62.)

In 2014, Petitioner filed an amended habeas corpus petition, raising the following five claims: (1) the trial court erred in failing to give the standalone instruction on the presumption of innocence and burden of proof standards; (2) Cruz's motion for substitution of judge was made in bad faith; (3) the State's "misconduct and improprieties" denied Petitioner his right to a fair trial;

(4) trial counsel was ineffective in failing to request the accomplice-witness jury instruction; and (5) appellate counsel was ineffective in failing to raise the aforementioned ineffective assistance of trial counsel argument on direct appeal. (Dkt. 66.)

The Court granted Petitioner's motion to stay pending his pursuit of a successive post-conviction proceedings in state court. (Dkt. 80; Dkt. 103.) In 2019, the stay was lifted upon Petitioner's request. (Dkt. 146.) Petitioner filed the instant counseled second amended habeas corpus petition, (Dkt. 158), raising the following five claims:

1. The trial court deprived Petitioner of a fair trial in failing to give a standalone instruction on: (a) the State's burden of proof and (b) the presumption of innocence.

2. Petitioner received: (a) ineffective assistance of trial counsel for failing to request an accomplice-witness instruction, and (b) ineffective assistance of appellate counsel for failing to raise the issue on direct appeal.

3. Petitioner was denied his right to a fair trial when the State knowingly elicited false testimony from Padilla.

4. Petitioner was denied his right to a fair trial when the State knowingly elicited false testimony from Cruz.

5. Ineffective assistance of trial counsel for representing Petitioner under a conflict of interest.

Although the stay of the instant habeas corpus proceedings was lifted at Petitioner's request, (Dkt. 146), and the parties briefed the instant habeas corpus petition, Petitioner's 2015 successive post-conviction petition remained pending in the state courts. (Dkt. 101-1.) On June 29, 2022, the Appellate Court of Illinois reversed a prior dismissal of Petitioner's 2015 successive post-conviction petition and remanded the matter for an evidentiary hearing on claims of trial counsel's conflict of interest (which he presents to this Court as Claim 5) and a freestanding claim of actual innocence. *See People v. Ayala*, 2022 IL App (1st) 192484.

In light of the state appellate court's ruling, this Court requested additional briefing from the parties as to their respective positions regarding the impact of the Appellate Court of Illinois' ruling on Petitioner's fully briefed habeas corpus petition. (Dkt. 185.) Petitioner, through counsel, elected to voluntarily dismiss Claim 5. (Dkt. 186.) The parties agree that Petitioner's remaining claims are fully exhausted and can be resolved by the Court. *Id.* Petitioner further requested the Court rule on his remaining claims despite his pending actual innocence claim in state court. *Id.* Respondent has no objection to Petitioner's elections. *Id.* Claim 5, as requested by Petitioner, is dismissed. Fed. R. Civ. P. 41(a)(1)(B); *Rhines v. Weber*, 544 U.S. 269, 278 (2005) (citing *Rose v. Lundy*, 444 U.S. 509, 520 (1982)) (recognizing that a prisoner can voluntarily dismiss an unexhausted claim and proceed with his remaining exhausted claims). The Court now turns to Petitioner's remaining exhausted claims.

## ANALYSIS

The Court first addresses Respondent's statute of limitations and procedural default arguments followed by a merits analysis of the remaining claims. The Court holds that Claims 2 and 4 are procedurally defaulted (and also, in the alternative, are meritless), and Claims 1 and 3 are meritless. The Court rejects Respondent's procedural default argument for Claim 1(a) and statute of limitations argument for Claim 4.

## I.     Respondent's Statute of Limitations Argument

Respondent argues that Claim 4 is untimely because Petitioner failed to assert his claim that the State suborned perjured testimony from Cruz in his 2014 first amended habeas corpus petition. (Dkt. 172, pg. 31-34.) A one-year statute of limitations governs habeas corpus petitions. 28 U.S.C. § 2244(d). The limitations period begins to run from the latest of the following: "(A)

11

the date on which the judgment became final…; (B) the date on which an impediment to filing an application created by State action in violation of the Constitution or [federal] laws is removed…; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized…and made retroactively applicable…; or (D) the date on which the factual predicate of the claim…could have been discovered through the exercise of due diligence." § 2244(d)(1)(A)-(D). The limitations period is tolled during the pendency of a properly filed state post-conviction, or other collateral, proceeding. § 2244(d)(2).

Petitioner's direct appeal ended in 1986 meaning that his one-year limitations period under § 2244(d)(1)(A), commenced on the Antiterrorism and Effective Death Penalty Act's (AEDPA) enactment date of April 24, 1996. *Allen v. Siebert*, 552 U.S. 3, 4 (2007) (per curiam). The April 24, 1996, date is the proper date for calculating the statute of limitations as § 2244(d)(1)(B)-(D) are inapplicable to this case with the record not suggesting the use of these other provisions, and the parties make no argument for a date other than April 24, 1996.

Petitioner's original petition, (Dkt. 1), is timely as it was filed in September 1996. Judge Coar dismissed the original petition without prejudice with leave to reinstate within 60 days of the completion of Petitioner's state court proceedings. (Dkt. 49.) A dismissal without prejudice with leave to reinstate is the functional equivalent of a stay. *Arrieta v. Battaglia*, 461 F.3d 861, 863 (7th Cir. 2006). As a result, the original habeas corpus petition effectively remained pending while Petitioner proceeded with his state post-conviction proceedings.

In addition to filing his original habeas corpus petition in 1996, Petitioner also had a then-pending state post-conviction proceeding that ended with the denial of his PLA by the Supreme Court of Illinois on September 25, 2013. This resulted in an additional ground for tolling the statute

of limitations under 28 U.S.C. § 2244(d)(2). Although Petitioner's state post-conviction proceedings are complex, the Court need not engage in an in-depth analysis of whether the post-conviction proceedings all tolled because Respondent's answer affirmatively asserts that it does. (Dkt. 172, pg. 31) ("Because petitioner's conviction became final before the AEDPA's effective date, the limitations period began to run on April 24, 1996, the date the AEDPA took effect. Petitioner's postconviction proceedings were then pending in state court, so the statute of limitations was tolled until September 25, 2013, when the Illinois Supreme Court denied his postconviction PLA.").

Petitioner complied with Judge Coar's dismissal order returning to federal court within 60 days of the September 25, 2013, completion of his state court proceedings with his November 18, 2013, motion seeking to extend the stay so that he could bring a successive state post-conviction petition. (Dkt. 51.) Petitioner's compliance with Judge Coar's dismissal order with a timely return to federal court means there is no concern of a "springing" judgment in this case, and Judge Coar's order was, as explained above, a stay. *See Shapo v. Engle*, 463 F.3d 641, 644 (7th Cir. 2006); *Dolis v. Chambers*, 454 F.3d 721, 723 (7th Cir. 2006); *Shah v. Inter-Cont'l Hotel Chi. Operating Corp.*, 314 F.3d 278, 281 (7th Cir. 2002). Thus, Petitioner's one-year statute of limitations period expired on September 25, 2014, because Petitioner did not have any pending state court proceedings during that period to qualify for tolling under 28 U.S.C. § 2244(d)(2).[5]

As mentioned, Petitioner filed his original petition in 1996, so that petition is timely. Petitioner filed an amended petition in March 2014, (Dkt. 66), meaning the amended petition is

---

5 Any subsequent state court post-conviction proceeding filed after the September 2014 federal statute of limitations expiration has no impact on the statute of limitations calculation under § 2244(d)(2). *Dolis*, 454 F.3d at 723 (quoting *Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005)) ("'The state court's willingness to entertain a belated collateral attack on the merits does not affect the timeliness of a federal proceeding…'").

timely as well. Petitioner then filed the instant counseled second amended petition in December 2019. This petition, filed multiple years after the expiration of the statute of limitations, is only timely if it relates back to a timely petition.

Claims raised in the 2019 petition must have a "common core of operative facts" to those in the original petition to relate back for statute of limitations purposes. *Mayle v. Felix*, 545 U.S. 644, 664 (2005); Fed. R. Civ. P. 15(c). If the claim asserts a new ground for relief supported by facts that differ in both time and type from those originally asserted, the claim "does not relate back (and thereby escape AEDPA's one-year time limit)." *Id.* at 650.

Turning to Claim 4 in the 2019 second amended petition, Petitioner alleges that he was denied the right to a fair trial because the State knowingly used Cruz's false testimony regarding the gang meeting at Ayala's house. (Dkt. 158, pg. 49-56.) This claim was raised in his original 1996 petition, (Dkt. 1, pg. 7), but his 2014 *pro se* first amended petition did not articulate the claim as clearly. The only mention of Cruz in the 2014 petition involves an unrelated substitution of judge issue. (Dkt. 66, pg. 11-13.) The 2014 amended petition instead raised what appears to be unrelated issues of alleged prosecutorial misconduct—wrongful pressuring of Padilla, Jacquez, and Hodge to testify falsely either at trial or before the grand jury. (Dkt. 66, pg. 13-18.)

Respondent argues that the dropping of the claim from the 2014 *pro se* amended petition dooms relation back because the 2014 amended petition supersedes the original 1996 petition. (Dkt. 172, pg. 33.) With the dropping of the claim from the 2014 petition, there is nothing for the 2019 petition to connect to for purposes of relation back according to Respondent. Petitioner counters that he did raise the issue in his first amended petition, but did so in an inartful manner.

14

Respondent's argument is predicated upon a belief that the 2014 petition became the relevant pleading for the relation back analysis, but that is incorrect because relation back is to the original pleading. "An amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). "The central inquiry under Rule 15(c) is whether the original complaint gave the defendant enough *notice* of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 741 (7th Cir. 2018) (internal quotation marks and citations omitted) (emphasis added); *see also Mayle*, 545 U.S. at 664 ("So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order.").

There is no dispute that Claim 4 was raised in both the original 1996 habeas corpus petition and the instant 2019 second amended petition. Respondent's statute of limitations argument for Claim 4 is therefore rejected.

## II.    Procedurally Defaulted Claims

Respondent further argues that Claims 1(a), 2, and 4 are procedurally defaulted. A habeas corpus claim can be procedurally defaulted in two ways. The first occurs when a prisoner fails to fully exhaust state court remedies for his federal claim and no longer has the ability to do so under the state's procedural laws. *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016); 28 U.S.C. § 2254(b)(1)(A). In other words, state prisoners must "'fairly present[]'" their federal claims to the state courts "so that the state has a 'fair opportunity to consider' the issues 'and to correct that

asserted constitutional defect'" before seeking federal habeas corpus relief. *Reynolds v. Hepp*, 902 F.3d 699, 705 (7th Cir. 2018) (quoting *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)). To satisfy the exhaustion requirement, state prisoners must "invok[e] one complete round of the State's established appellate review process," which in Illinois, includes a PLA to the state supreme court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

The second type of procedural default "comes from the independent and adequate state ground doctrine." *Thomas*, 822 F.3d at 384 (citing *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)). Federal courts will not review the merits of a habeas corpus claim "if the relevant state court's disposition of the claim rests on a state law ground that is adequate and independent of the merits of the federal claim." *Triplett v. McDermott*, 996 F.3d 825, 829 (7th Cir. 2021) (citing *Johnson v. Lee*, 587 U.S. 605, 606 (2016) (per curiam); *Crockett v. Butler*, 807 F.3d 160, 167 (7th Cir. 2015)). "The ground is adequate if it is 'firmly established and regularly followed,'" *id.* (quoting *Richardson v. Lemke*, 745 F.3d 258, 271 (7th Cir. 2014)), and "[i]t is independent of federal law if it does not depend on the merits of petitioner's claim." *Id.* (citing *Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam)).

The Court may excuse a procedural default only if Petitioner "demonstrates either (1) 'cause for the default and actual prejudice,' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Thomas*, 822 F.3d at 386 (quoting *Coleman*, 501 U.S. at 750).

### A.    Claim 1(a) is Not Procedurally Defaulted

In Claim 1, Petitioner argues due process violations under *In re Winship*, 397 U.S. 358 (1970), for the failure to formally instruct the jury on the beyond a reasonable doubt standard

(Claim 1(a)), and under *Kentucky v. Whorton*, 441 U.S. 786 (1979) (per curiam), for the failure to properly instruct the jury on the presumption of innocence standard (Claim 1(b)). Respondent contends that the former is procedurally defaulted because Petitioner's counseled PLA on direct appeal raised only Claim 1(b). (Dkt. 172, pg. 10.) Upon review of the record, however, it is clear that Petitioner fully exhausted both his burden of proof and presumption of innocence challenges on direct appeal.

On direct appeal, the state appellate court addressed Petitioner's claim that he was denied a fair trial because the jurors did not receive a formal, standalone instruction on the presumption of innocence and burden of proof standards.[6] *Direct Appeal*, 491 N.E.2d at 156. Petitioner challenged the state appellate court's rejection of this claim in his counseled PLA, maintaining that his rights to a fair trial and due process were violated where "neither the presumption of innocence or reasonable doubt instructions were given to the jury." (Dkt. 71-3, pg. 10.)

Although Petitioner's PLA does not cite to *Winship* in support of his burden of proof argument, the absence of such a citation does not doom Petitioner's claim as Respondent so contends. Federal habeas corpus courts typically consider four factors when determining whether a federal claim has been "fairly presented" to the state courts: "1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Hicks v. Hepp*, 871 F.3d 513, 531 (2017) (citing *Ellsworth v. Levenhagen*, 248 F.3d

---

6 Although the state court record does not include the briefs from Petitioner's direct appeal, neither party argues their absence affects the procedural default analysis of any of Petitioner's claims.

634, 639 (7th Cir. 2001)). Ultimately, this Court's overall task is to determine in practical terms whether the state courts were "sufficiently alerted to the nature of [Petitioner's] federal constitutional claim." *Id.* (internal quotation marks and citation omitted).

Petitioner's PLA satisfies the fair presentment requirement to preserve Claim 1(a) for federal habeas corpus review. The PLA repeatedly asserts Petitioner's burden-of-proof-instruction challenge, arguing the failure to give the standalone instruction on this principle (along with the presumption of innocence) amounts to reversible error. (Dkt. 71-3, p. 9-29.) In support of this argument, Petitioner relied on "state cases which appl[ied] a constitutional analysis to similar facts." *Id.*; *see also* (Dkt. 17-3, pg. 12) (citing *People v. Carpenter*, 428 N.E.2d 983, 986 (Ill. App. Ct. 1981) (citing *Winship* in addressing petitioner's challenge to trial court's failure to instruct jury on presumption of innocence and proof beyond a reasonable doubt)). And the framing of his claim overall calls to mind the commands of *Winship* in criminal proceedings. 397 U.S. at 364.

Thus, although Petitioner could have been more explicit in asserting a *Winship* argument, his direct appeal PLA presented his beyond a reasonable doubt challenge in such a manner so as to allow the Supreme Court of Illinois the opportunity to address his federal constitutional claim. The Court therefore rejects Respondent's Claim 1(a) procedural default argument.

## B. Claim 2 is Procedurally Defaulted Under Both the Independent and Adequate State Ground and Exhaustion Doctrines

Claim 2 alleges Petitioner was denied effective assistance of counsel where his trial attorney failed to request an accomplice-witness jury instruction (Claim 2(a)), and where his appellate counsel failed to raise trial counsel's error on direct appeal (Claim 2(b)). (Dkt. 158, pg. 36-45.) Respondent correctly argues that Petitioner's ineffective assistance of trial counsel claim is procedurally barred under the independent and adequate state ground doctrine, and his

18

ineffective assistance of appellate counsel claim is procedurally defaulted under the exhaustion doctrine. (Dkt. 172, pg. 16-23.)

### 1. Claim 2(a): Ineffective Assistance of Trial Counsel

As to his ineffective assistance of trial counsel claim, Petitioner submits that this claim is not procedurally defaulted because the state court did not dismiss his claim on independent and adequate state grounds, arguing instead that the state appellate court determined "with no analysis" the claim was barred by *res judicata* "before promptly turning to considering the merits of the constitutional claim." (Dkt. 182, pg. 14-16.) Petitioner's argument is unavailing.

Petitioner's ineffective assistance of trial counsel claim was last substantively reviewed by the state appellate court as part of Petitioner's 2013 post-conviction appeal. *2013 Post-Conviction Appeal*, ¶¶ 28-39. The state appellate court rejected Petitioner's claim, holding:

> We find that petitioner's claims regarding IPI 3.17[7] are forfeited because they could have been raised on direct appeal, but were not, and are also subject to *res judicata* because they were raised in his initial *pro se* postconviction petition, but were subsequently abandoned.

*Id.* at ¶ 29. In support of its forfeiture holding,[8] the state appellate court explained: "On direct appeal, petitioner argued, among other things, that the trial court erred by failing to instruct the jury on the presumption of innocence and the burden of proof… However, petitioner failed to raise the issue regarding IPI 3.17, and therefore the issue is forfeited." *Id.* at ¶ 30.

---

7 Illinois Pattern Jury Instruction (IPI) 3.17 is the jury instruction regarding accomplice witness testimony. The instruction provides: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Ill. Pattern Jury Instr.-Criminal 3.17.

8 Illinois courts often use the terms "waiver" and "forfeiture" interchangeably. *See People v. Blair*, 215 N.E.2d 604, 614-15 (Ill. 2005). The distinction, however, is irrelevant for purposes of habeas corpus review. *See Richardson*, 745 F.3d at 269 n.5 ("We need not discuss whether [petitioner's] failure to object constituted a 'waiver' or a 'forfeiture' under our own case law, as the Illinois Supreme Court is free to decide what to call such a failure within that state's judicial system.").

"Under Illinois law, '[f]ailure to raise a claim which could have been addressed on direct appeal is a procedural default which results in a bar to consideration of the claim's merits in a post-conviction proceeding.'" *Sturgeon v. Chandler*, 552 F.3d 604, 611 (7th Cir. 2009) (quoting *People v. Erickson*, 641 N.E.2d 455, 458 (Ill. 1994)). "A finding of waiver by the state postconviction court is enough to establish an adequate and independent state ground." *Sturgeon*, 552 F.3d at 611 (citing *Daniels v. Knight*, 476 F.3d 426, 431 (7th Cir. 2007)); *see also Krol v. Calhoun*, No. 16 CV 11595, 2019 WL 5592757, at *11 (N.D. Ill. Oct. 30, 2019). The state appellate court's forfeiture holding results in the procedural default of Petitioner's ineffective assistance of trial counsel claim.

Moreover, the state appellate court's alternative merits holding does not affect the finding of procedural default. A state court may rely on a state procedural ground to deny a claim and then, in the alternative, determine that the claim lacks merit. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.") (emphasis in original). Thus, "even if the court rejected [Petitioner's] claim as meritless," "[federal habeas] review is foreclosed when adequate and independent state law grounds are sufficient to resolve the dispute." *Whyte v. Winkleski*, 34 F.4th 617, 627 (7th Cir. 2022), *reh'g denied*, No. 21-1268, 2022 WL 3326896 (7th Cir. Aug. 11, 2022). Forfeiture provided a sufficient basis for the state appellate court to reject Petitioner's ineffective assistance of trial counsel argument. Claim 2(a) is procedurally defaulted.

## 2.    Claim 2(b):    Ineffective Assistance of Appellate Counsel

As to Petitioner's ineffective assistance of appellate counsel argument, this claim is procedurally defaulted on exhaustion grounds. Petitioner challenged appellate counsel's failure to raise the accomplice-witness jury instruction issue on direct appeal in his original *pro se* 1991 post-conviction petition, (Dkt. 71-12, pg. 8-9), and in his 2013 post-conviction appeal. (Dkt. 71-2, pg. 34.) His ineffective assistance of appellate counsel claim, however, was not fairly presented to the Supreme Court of Illinois in his post-conviction PLA. *See* (Dkt. 71-1, pg. 24-25) (Petitioner's post-conviction PLA argued his false testimony claim predicated on Padilla's affidavit was rejected based on improper credibility determinations and the state appellate court's 1993 post-conviction amounted to an unlawful partial summary dismissal).

Fair presentment, a corollary requirement of the exhaustion doctrine, "contemplates that both the operative facts and the controlling legal principles must be submitted to the state court…through one complete round of state court review." *Malone v. Walls*, 538 F.3d 744, 753, 756 (7th Cir. 2008) (internal quotation marks and citations omitted). In other words, Petitioner must "articulat[e] the point in such a way that a judge could grasp both its substance and its foundation in federal law." *Lockheart v. Hulick*, 443 F.3d 927, 929 (7th Cir. 2006).

Petitioner contends that he expressly argued in his counseled post-conviction PLA that his appellate counsel was ineffective for not raising on direct appeal trial counsel's failure to tender the accomplice-witness jury instruction. (Dkt. 182, pg. 16.) The Court acknowledges that the PLA asserts that Petitioner alleged both an ineffective assistance of trial counsel claim and an ineffective assistance of appellate counsel claim regarding the accomplice witness instruction in his post-conviction petition, and argues that this claim made a "substantial showing of a constitutional

violation" that should have survived to second-stage proceedings under the Illinois Post-Conviction Hearing Act. (Dkt. 71-1, pg. 24-26.) Petitioner's argument, however, centers around the standards governing the state's post-conviction proceedings, *see* 725 ILCS 5/122-1, particularly the alleged error in the state appellate court's holding that partial summary dismissals of post-conviction petitions are permissible. (Dkt. 71-1, pg. 24-26.) Indeed, Petitioner specifically requested the state supreme court grant leave to appeal "to correct the appellate court's erroneous holding that partial summary dismissals of post-conviction petitions are allowed." *Id.* at 24. These are clearly issues of state law, and in framing his claim in this manner, Petitioner failed to "alert[] the state court to the federal nature of his claim in a manner sufficient to allow the court to address the issue on a federal basis." *Lieberman v. Thomas*, 505 F.3d 665, 670 (7th Cir. 2007). Petitioner therefore did not exhaust his ineffective assistance of appellate counsel claim. Claim 2(b) is procedurally defaulted.[9] *See Boerckel*, 526 U.S. at 845.

---

9 Beyond the procedural default, Claims 2(a) and (b) would be meritless. The last court to address Petitioner's ineffective assistance of trial counsel claim on the merits was the state appellate court in the 2013 post-conviction appeal. The appellate court set forth both prongs of the controlling *Strickland v. Washington*, 466 U.S. 668 (1984), standard and correctly explained that the court need not analyze the performance prong where it can dispose of the ineffectiveness claim on the ground that Petitioner did not suffer prejudice. *2013 Post-Conviction Appeal*, ¶¶ 36-37; *see Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). The court correctly defined *Strickland* prejudice as "a reasonable probability that, absent the errors, the outcome would have been different." *Id.* at ¶ 36; *see Strickland*, 466 U.S. at 694. The court, "applying these principles," *id.* at ¶ 37, proceeded to consider other jury instructions given at trial as well as defense counsel's refences to Cruz's alleged lies during his closing argument. *Id.* at ¶¶ 37-39. The appellate court concluded Petitioner failed to show the particular language contained in the absent jury instruction "would have made a difference in this case." *Id.* at ¶ 39. Although the state appellate court did not include the "reasonable probability" phrasing in its conclusion, its imprecise description of *Strickland*'s prejudice standard does not render its decision "contrary to" federal law where it is clear from the record, as it is here, that the court understood and applied the correct test. *Holland v. Jackson*, 542 U.S. 649, 655 (2004).

Further, the state court's determination was not objectively unreasonable. An unreasonable application of federal law means "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). In applying the deferential AEDPA standard to a *Strickland* analysis, this Court is required to afford an additional level of deference and latitude to the state court's determination than it does under the *Strickland* standard alone. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Here, the state appellate court reasoned that the jury was well aware it should carefully consider Cruz's testimony based on the jury instruction regarding witness credibility, generally, *see* Ill. Pattern Jury Instr.-Criminal 1.02

22

### C.    Claim 4 is Procedurally Defaulted Under the Exhaustion Doctrine

Claim 4 contends Petitioner was deprived of a fair trial where the State knowingly suborned perjured testimony from Cruz. (Dkt. 158, pg. 49-56.) Petitioner's perjured testimony claim was not raised on direct appeal. Instead, he raised the claim for the first time in his 1991 supplemental *pro se* post-conviction petition, (Dkt. 71-12, pg. 56-68), and thereafter in his 1993 post-conviction appeal. (Dkt. 71-10, pg. 52-54.) The claim, however, was never presented to the Illinois Supreme Court. (Dkt. 71-1, pg. 9-26) (Petitioner's post-conviction PLA raised issues regarding Padilla's affidavit and the state appellate court's partial summary dismissal of his post-conviction petition). Petitioner's failure to present his perjured testimony claim in a PLA to the Illinois Supreme Court renders the issue unexhausted. *Boerckel*, 526 U.S. at 845. Claim 4 is therefore procedurally defaulted.[10]

---

(instructing jurors to consider "any interests, bias, or prejudice" a witness may have in evaluating their credibility), and the jury instruction regarding evidence of prior convictions, *see* Ill. Pattern Jury Instr.-Criminal 3.12 (advising jurors that a witness's prior conviction "may be considered…only as it may affect the believability of a witness"). *2013 Post-Conviction Appeal*, ¶¶ 37-38 ("We believe that the substance of IPI 3.17, was sufficiently covered by IPI 1.02 and IPI 3.12."); *see also Charlton v. Davis*, 439 F.3d 369, 375 (7th Cir. 2006) (finding no prejudice resulted from counsel's decision not to request an instruction—the substance of which "was covered by other instructions"); *Conner v. McBride*, 375 F.3d 643, 667-68 (7th Cir. 2004). Additionally, the jury knew Cruz received a "sweet [plea] deal" in exchange for his testimony, as that fact was drawn out on cross-examination and repeated during closing argument, along with other arguments that Cruz had motive to give false testimony and lacked credibility. (Dkt. 71-20, pg. 139-63; Dkt. 71-6, pg. 443-52, 463-66.)

Given these other instructions and the emphasis on Cruz's plea deal and credibility during cross-examination and closing argument, the state appellate court's determination of no *Strickland* prejudice was not unreasonable. *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) ("'unreasonable'…means something like lying well outside the boundaries of permissible differences of opinion"). Because Petitioner's ineffective assistance of trial counsel claim is meritless, his ineffective assistance of appellate counsel claim fails. Appellate counsel is not ineffective for failing to raise a meritless claim. *See Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013). Therefore, Claims 2(a) and (b) are meritless in addition to defaulted.

10  Despite Petitioner's procedural default, Judge Coar's opinion (that he later vacated so that Petitioner could proceed with his state post-conviction proceedings) considered the merits of Petitioner's perjury claim as to Cruz's testimony, and held the state appellate court's 1993 ruling that such allegations were "conclusional" was "not based on an unreasonable determination of facts given the record" as Petitioner could not establish by clear and convincing evidence that Cruz lied or that the State knew Cruz was lying. (Dkt. 43, pg. 10-11); *see also Napue v. Illinois*, 360 U.S. 264, 269-70 (1959); *Ashburn v. Korte*, 761 F.3d 741, 757 (7th Cir. 2014) (internal quotation marks and citations omitted) ("Under *Napue*, a petitioner must show that: (1) the prosecution's case included perjured testimony; (2) the

### III.    Petitioner Cannot Excuse the Procedural Defaults of Claims 2 and 4

Because Claims 2 and 4 are procedurally defaulted, Petitioner may only obtain habeas

corpus review of his claims if he can demonstrate either cause and prejudice or that the failure to

review his claims will result in a fundamental miscarriage of justice, i.e., new, reliable evidence

exists demonstrating that no reasonable trier of fact would have found Petitioner guilty. *See*

---

prosecution knew, or should have known, of the perjury; and (3) there is any likelihood that the false testimony could have affected the judgment of the jury.").

The Court agrees with this analysis. Like his original habeas corpus petition, Petitioner's second amended habeas corpus petition again relies on affidavits from Robert Jacquez, Tom Gutierrez, and Vince Hodge in support of his Cruz-perjured-testimony claim. (Dkt. 158, pg. 49-52). Petitioner puts particular emphasis on the claims in Jacquez's affidavit that he made false statements to the grand jury and knew Cruz lied about the gang meeting. (Dkt. 71-13, pg. 62-63.) As Judge Coar explained, however, the impeached testimony and allegations in these affidavits may call into question Cruz's credibility and demonstrate that Jacquez lied; but they are not sufficient to show the State knew Cruz was lying. Petitioner was required to show that the State "knowingly and intelligently introduced the allegedly false testimony at trial." *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1387 (7th Cir. 1994) (citing *Burnett v. Illinois*, 619 F.2d 668, 674 (7th Cir. 1980)). Petitioner fails to make such a showing.

Additionally, defense counsel thoroughly cross-examined Cruz at trial during which he discredited his testimony, emphasized his plea deal, called into question the veracity of his allegations regarding the gang meeting, and had the opportunity to expose any alleged falsities in his account of the murders. (Dkt. 71-20, pg. 139-97; 200-32.); *see also Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2005) (citing *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995)) ("We must determine, when the defendant alleges that the prosecution used perjured testimony, whether the defendant had an adequate opportunity to expose the alleged perjury on cross-examination."). Defense counsel also made full use of his closing argument to emphatically address the alleged inconsistencies and lies in Cruz's testimony, noting "a direct contradiction" in the witness's account of how he came to arrive at Ayala's house for the gang meeting on the day of the murders and emphasizing to the jury that "[Cruz] lied. He lied throughout his testimony." (Dkt. 71-6, pg. 444.) Petitioner's attorney reiterated that Cruz, "again, lied…" when he testified about certain attendees at Ayala's gang meeting whose alibis established that they could not have been in attendance. *Id.* at 445. Counsel repeated this theme throughout his closing argument, emphasizing to the jury that they "cannot convict based on lies." *Id.* at 446.

Given the opportunity to expose Cruz's alleged falsities at trial, the state appellate court's determination that Petitioner could not establish a perjured testimony claim was not unreasonable. *See Saadeh*, 61 F.3d at 523-24 (rejecting perjured testimony claim where petitioner "had ample opportunity…to cross-examine [witness] during trial, discredit him, and expose any alleged perjury"). Like Judge Coar noted, Petitioner's claim may raise questions as to Cruz's credibility. But these questions were raised and repeated throughout Petitioner's trial. While the affidavits Petitioner points to in support of his false testimony claim are consistent with Petitioner's theory of the case, i.e., that Cruz was not a credible witness, they do not establish a knowing use of his false testimony at trial. Claim 4 is meritless in addition to being defaulted.

*Thomas*, 822 F.3d at 386. The Court will first address Petitioner's cause-and-prejudice arguments as to each claim.

### A.    Cause and Prejudice

To establish "cause" to excuse a procedural default, "the prisoner must 'show that some objective factor external to the defense impeded [hi]s efforts to comply with the State's procedural rule.'" *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991)).

Ineffective assistance of counsel does not excuse the defaults of Claims 2 or 4. An ineffective assistance of counsel argument asserted to excuse a default must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner did not exhaust such a claim. And allegations of ineffective assistance of post-conviction counsel do not qualify as cause to excuse a procedural default as there is no constitutional right to counsel in state post-conviction proceedings. *Davila*, 137 S. Ct. at 2063. Petitioner therefore cannot show cause to excuse the procedural default of Claims 2 or 4 on these grounds.

Additionally, Petitioner contends that cause exists to excuse the procedural default of Claim 2 based on the state courts' failure to consider the ineffective assistance claim on the merits and inordinate delay. (Dkt. 182, pg. 19-20.) Petitioner's first argument appears to be predicated on the partial-summary-dismissal issue that was raised in his post-conviction PLA and denied by the

Supreme Court of Illinois. (Dkt. 71-1, pg. 25-26) ("The accomplice-witness instruction issue has never been litigated and it advanced to the second stage when the appellate court reversed the summary dismissal of the petition in 1993."). This claim is based on Illinois law that precludes partial summary dismissals of post-conviction petitions. *See People v. Rivera*, 763 N.E.2d 306, 312-13 (Ill. 2001). A federal habeas corpus court, however, "is not the proper body to adjudicate whether a state court correctly interpreted its own procedural rules, even if they are the basis for a procedural default." *Johnson v. Foster*, 786 F.3d 501, 508-09 (7th Cir. 2015) (citation omitted).

As for Petitioner's second argument, inordinate delay constitutes cause to excuse a defaulted, unexhausted claim when there is a delay in state proceedings that is both "inordinate" and "unjustifiable." *Lane v. Richards*, 957 F.2d 363, 365 (7th Cir. 1992). An inordinate delay argument is mooted, however, once the state court proceeds with the delayed proceeding. *Allen v. Duckworth*, 6 F.3d 458, 459-60 (7th Cir. 1993). Put another way, inordinate delay excuses the exhaustion requirement, but it does not cure a procedural default. The issue here is procedural default—not exhaustion, as Petitioner completed exhaustion upon the filing of his post-conviction PLA, (Dkt. 71-1, pg. 9-26), and the Supreme Court of Illinois' subsequent denial. *Soto*, 996 N.E.2d 21. His inordinate delay argument is therefore moot and does not serve as a basis to excuse the default of Claim 2.

Petitioner's cause-and-prejudice argument as to Claim 4 fails for the same reasons cited above. Here, too, Petitioner contends the state courts' erroneous procedural determinations following the remand of his initial 1991 *pro se* post-conviction petition constitute cause to excuse the procedural default of his claim. (Dkt. 158, pg. 54-55; Dkt. 182, pg. 25-26.) As explained above, it is not the province of this Court to review alleged errors of state law, even if they are being

argued as a basis for procedural default. *Johnson*, 786 F.3d at 508-09. Further, to the extent Petitioner claims post-conviction appellate counsel failed to adequately preserve his perjured testimony argument, (Dkt. 158, pg. 55; Dkt. 182, pg. 25-26), this claim does not constitute cause to excuse his default. *Davila*, 137 S. Ct. at 2062-63. Accordingly, Petitioner cannot excuse the procedural default of Claim 4 on these grounds.

### B. Fundamental Miscarriage of Justice

This leaves the fundamental miscarriage of justice exception. This exception is reserved for the truly exceptional case where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citation omitted). To show actual innocence to excuse a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup*, 513 U.S. at 329). This is a "demanding and seldom met" standard. *McQuiggin*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial—such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDowell v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")).

27

In support of his actual evidence claim, Petitioner points to affidavits from Juan Padilla, Thomas Gutierrez, Vince Hodge, and Robert Jacquez.[11] Petitioner claims that Padilla's affidavit establishes that he was not responsible for the shooting, and that the affidavits of Gutierrez, Hodge, and Jacquez prove that there was no gang meeting at Ayala's house and that Cruz's testimony against Petitioner was false. (Dkt. 182, pg. 21.) These affidavits, however, fall short of what is necessary under the demanding actual innocence standard.

As for Padilla, he testified at trial that he was shot in the "lower right buttocks" as he was crawling away from the gunshots and did not see the shooters. (Dkt. 71-20, pg. 343-44.) It was not until six years later that Padilla offered a new version of events, claiming that he could see the shooters and identified them as Cruz and either John Rojas or Victor Rodriguez. (Dkt. 71-13, pg. 61; Dkt. 71-15, pg. 29) (The record includes two affidavits from Padilla, one indicating the second shooter was Rojas, and the other identifying Rodriguez in a handwritten notation in the margin of the page. Petitioner provides no explanation for the discrepancy). "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing" to establish actual innocence. *McQuiggin*, 133 S. Ct. at 385; *see also Blackmon v.*

---

11 In his reply brief, Petitioner indicates "the record is not fully developed" on his actual innocence argument "because Petitioner was *denied* an evidentiary hearing on his compelling innocence claims." (Dkt. 182, pg. 21) (emphasis in original). As noted above, the Appellate Court of Illinois recently remanded Petitioner's successive post-conviction petition for an evidentiary hearing on his freestanding claim of actual innocence. *See People v. Ayala*, 2022 IL App (1st) 192484. Despite his pending actual innocence claim in state court, Petitioner has requested the Court rule on his habeas corpus petition—asserting the differences between the federal actual-innocence gateway standard and Illinois' freestanding actual innocence standard do not preclude this Court's review. *Compare Cal v. Garnett*, 991 F.3d 843, 850 (7th Cir. 2021) (federal actual-innocence claims serve as a means to obtain a merits review of a procedurally defaulted claim), *with People v. Shaw*, 143 N.E.2d 228, 240 (Ill. App. Ct. 2019) (claims of actual innocence in Illinois are cognizable issues for post-conviction relief). This Court must determine whether the facts underlying Petitioner's federal actual innocence claim "could establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty." *See Coleman v. Hardy*, 628 F.3d 314, 322-23 (7th Cir. 2010) (citing 28 U.S.C. § 2254(e)(2)(B)). Based on the new evidence presented by Petitioner, namely the affidavits of Padilla, Gutierrez, and Hodge, the Court does not find the allegations of these affiants meet this standard to warrant an evidentiary hearing on his actual innocence claim. *Id.*

*Williams*, 823 F.3d 1088, 1102 (7th Cir. 2016) ("Furthermore, they did not come forward until eight years after the murder, a substantial delay that could affect their memories and/or their credibility."); *McDowell*, 737 F.3d at 484 ("Such 'eleventh hour' affidavits containing facts not alleged at trial and accompanied by no reasonable explanation for delay are inherently suspect.").

Beyond the delay, a reasonable jury could plausibly reject Padilla's new assertions. First, Padilla's claim that the State threatened him regarding his alleged identifications prior to testifying is refuted by the police report that was completed directly following the murders wherein Padilla told detectives that "he did not know who did the shooting." (Dkt. 71-12, pg. 34.) Second, the reliability of his allegations is further called into question by the fact that Petitioner was facing away from the shooters as he crawled away from the gunfire, as is corroborated by the location of his gunshot wound to the lower back. (Dkt. 71-20, pg. 343-44.) Even if the reasonable jury moved beyond these difficulties, Petitioner presents, at most, a contest between inculpatory and exculpatory witnesses. But such a contest is insufficient to establish actual innocence. *See Blackmon*, 823 F.3d at 1102 ("balance between inculpatory and exculpatory witnesses is not enough to meet the demanding *Schlup* standard"); *Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010) (same); *Hayes*, 403 F.3d at 937 (7th Cir. 2005) (same).

The affidavits of Gutierrez, Hodge, and Jacquez do not fare any better.[12] Gutierrez's affidavit states that had he been called as a witness, he would have testified that he was not at Ayala's home on the day of the murders. (Dkt. 71-13, pg. 66-67.) Hodge avers that he knows Cruz

---

12 The record includes other affidavits not cited by Petitioner in his actual innocence argument, including: the affidavit of Joe Cruz (stating Cruz lied at the grand jury and at trial); Rene Calzada (stating Cruz admitted to making false statements); and Cheryl Atkins (stating Cruz admitted to her that he lied before the grand jury). (Dkt. 71-13, pg. 71-73.) As discussed above, such allegations call into question Cruz's credibility, but do not affirmatively establish Petitioner's actual innocence.

lied when he implicated "[Petitioner], Ayala, me and others." *Id.* at 64-65. Likewise, Jacquez alleges to have knowledge that Cruz lied about the gang meeting and that no such meeting took place on the day of the shootings. *Id.* at 62-63.

It is clear from the record, however, that the veracity of Cruz's testimony and statements to the police were repeatedly called into question during Petitioner's trial. Defense counsel made a point to have Cruz identify all of the individuals he claimed were at the gang meeting in Ayala's basement, and then presented witnesses who contradicted the very same. Other witnesses testified that Cruz told them he lied about Petitioner in relation to the Pietrowski Park murders. And, although the transcript of their testimony is not included in the record, Martha Ordonez and Diana Guana were allegedly called as alibi witnesses and testified that Petitioner never left Ayala's home on the day of the shootings. (Dkt. 158, pg. 12.)

Further, while the affidavits of Jacquez, Gutierrez, and Hodge corroborate the defense's theory of the case by calling into question Cruz's credibility, they do not provide information that would serve to exonerate Petitioner, who clearly places himself at Ayala's home on the day of the alleged conspiracy and resulting murders. In other words, these witnesses do not present the type of "powerful evidence" demonstrating Petitioner's innocence "so convincingly that no reasonable juror could convict." *Hayes,* 403 F.3d at 938 (citing *Schlup*, 513 U.S. at 324).

For the reasons discussed above, Petitioner cannot meet the demanding *Schlup* standard that establishes his actual innocence. Petitioner therefore cannot invoke this exception to excuse his procedural defaults. Claims 2 and 4 are procedurally defaulted.

### IV.     Claims Considered on the Merits

Turning to Claims 1 and 3, for claims adjudicated on the merits in state court, federal habeas relief may not be granted unless Petitioner demonstrates the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Armfield v. Niklaus*, 985 F.3d 536, 540-41 (7th Cir. 2021). As the Supreme Court "has stated unequivocally, and on more than one occasion, …clearly established law as determined by [the Supreme] Court refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Berkman v. Vanihel*, 33 F.4th 937, 945 (7th Cir. 2022) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004)). "It does not include reasonable extensions of those holdings in circuit precedent," *Berkman*, 33 F.4th at 945 (citation omitted), nor does it include "innovative constitutional interpretation[s]." *Baird v. Davis*, 338 F.3d 1110, 1115 (7th Cir. 2004) (citations omitted).

"A state-court decision will…be contrary to…clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases…[or]…confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams*, 529 U.S. at 405-06. For a state court decision to be an unreasonable application of clearly established federal law, "the ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam)). Petitioner "must 'show that the state court's ruling…was so lacking

in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Finally, to constitute an unreasonable determination of fact under § 2254(d)(2), the state court's decision must "rest upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399-400 (7th Cir. 2010) (citing *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003)). "The deference owed to state criminal judgments extends just as strongly—perhaps more so—to the state court's factual findings." *Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015). "A state court's factual determinations are cloaked with a presumption of correctness on federal habeas review," and Petitioner "has the burden to rebut this presumption by clear and convincing evidence." *Id.* (citing 28 U.S.C. § 2254(e)(1); *Kidd v. Lemke*, 734 F.3d 696, 703 (7th Cir. 2013)).

## A.  Claim 1:  Burden of Proof and Presumption of Innocence Instructions

In Claim 1, Petitioner argues that he was denied a fair trial where the trial court did not give a standalone instruction on the State's burden of proof of beyond a reasonable doubt (Claim 1(a)) and the presumption of innocence standard (Claim 1(b)). (Dkt. 158, pg. 23-36.) At trial, neither party requested the Illinois Pattern Jury Instruction that outlines these two principles,[13] and

---

13  The relevant instruction provides:

> The defendant is presumed to be innocent of the charge[s] against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty… The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence.

Ill. Pattern Jury Instr.-Criminal 2.03. The Committee Notes to IPI 2.03 explain that "[t]he firm commitment to presumed innocence which can be overcome only by proof beyond a reasonable doubt is the touchstone of American

the trial court did not provide the instruction to the jury. The Court will address each issue, beginning first with presumption of innocence (Claim 1(b)). The Court appreciates it is taking Claim 1(b) before 1(a), but, logically, the analysis proceeds better starting from Claim 1(b).

### 1.    Claim 1(b):    Presumption of Innocence Standard

In Claim 1(b), Petitioner argues that he was denied a fair trial because the jury did not receive a formal instruction on the presumption of innocence standard. (Dkt. 158, pg. 23-36.) The last state court to address Petitioner's claim in a reasoned decision on the merits was the state appellate court on direct appeal, making this the relevant decision for this Court's consideration. *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Greene v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)) ("The operative decision" for habeas corpus review "is that of the last state court to address a given claim on the merits.").

Although the presumption of innocence in favor of the defendant is a fundamental principle of criminal law, *Taylor v. Kentucky*, 436 U.S. 478, 483 (1978), the Supreme Court has held that the failure to instruct the jury on this principle "does not in and of itself violate the Constitution." *Kentucky v. Whorton*, 441 U.S. 786, 789 (1979) (per curiam). Rather, the omission of the presumption of innocence instruction is reviewed for harmless error. *Id.* Whether a defendant was denied a fair trial by the failure to instruct the jury on the presumption of innocence standard depends on the "totality of the circumstances," including "all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors." *Id.*; *see also Arizona v. Fulminante*, 499 U.S. 279, 307 (1991) (recognizing *Whorton* as a harmless error standard).

_____

criminal jurisprudence" and instruct that "[t]his instruction must be given in *all* cases..." *Id.* (emphasis in original).

In rejecting Petitioner's claim on direct appeal, the state appellate court correctly identified *Whorton* and applied the totality-of-the-circumstances test. *Direct Appeal*, 491 N.E.2d at 156-57. Accordingly, the state appellate court's decision was not "contrary to" clearly established federal law. 28 U.S.C. § 2254(d)(1). Equally, the state appellate court's holding was not unreasonable. *Id.* As instructed by *Whorton*, the state appellate court considered the relevant factors and determined the presumption of innocence standard was "adequately communicated to the jury," noting the trial court's explanation of this principle to all the jurors before *voir dire*, the trial court's repeated questioning of all prospective jurors regarding this principle during the jury selection process, and defense counsel's emphasis on this principle during closing argument. *Direct Appeal*, 491 N.E.2d at 157; *see also Dassey v. Dittmann*, 877 F.3d 297, 313 (7th Cir. 2017) (en banc) (citing *Yarborough*, 541 U.S. at 664-65) (explaining that a "totality-of-the-circumstances test gives [state] courts considerable room for judgment" that a federal court must respect when applying the deferential AEDPA standard).

The conclusion that the jury was adequately informed of the presumption of innocence standard is well-supported by the record. As the state appellate court noted, the trial court outlined the presumption of innocence standard to all prospective jurors before commencing *voir dire*, (Dkt. 71-22, pg. 130) ("Each defendant is presumed to be innocent and that presumption stays with the defendant throughout …and is not overcome unless from all the evidence you are convinced beyond a reasonable doubt that the defendant is guilty."),[14] and reiterated this standard in its questioning of prospective jurors to confirm their understanding. Specifically, the trial court

---

14 The Court notes that the portion of the transcript that includes the trial court's explanation of the presumption of innocence and burden of proof principles is nearly illegible. (Dkt. 71-22, pg. 130). The Court, however, can decipher, based on the parts of the text that are legible, that the quoted explanation was given.

addressed "all of the persons … seated in the jury box, as prospective jurors, and all of those not

seated in the jury box," (Dkt. 71-19, pg. 453), and asked:

> Another rule of law is that a defendant is presumed to be innocent, and that presumption stays with him through the case and is not overcome unless from all of the evidence, you are convinced beyond a reasonable doubt that the Defendant is guilty. Do you agree with that rule of law?

*Id.* at 454, 459.

Indeed, the trial court asked multiple questions to confirm the jurors' understanding of the

function of this principle within criminal proceedings, reiterating:

> Another rule is that a defendant may or may not take the stand and testify, and no presumption of guilt arises, if he does not testify[.] Do you agree with that rule?
> …
>
> And another rule of law is that the Defendant is not required to prove his innocence. Do you agree with that rule of law?

*Id.* at 454-455, 458-59. As the record reflects, none of the jurors raised their hands when asked if

there was anyone who did not both understand and agree with these principles of law. *Id.* at 459.

Petitioner contends the trial court's explanation of these principles to the jurors before and during

*voir dire* were insufficient to constitute an adequate instruction to the jury regarding the

presumption of innocence, but fails to cite any controlling authority that supports such an

argument. (Dkt. 158, pg. 32-33.) *Whorton* does not foreclose consideration of instructions provided

during *voir dire*, and instructs courts to consider all "relevant factors" when conducting the

harmless-error inquiry, which can reasonably be read to include explanations provided during the

jury selection process. 441 U.S. at 789.

Beyond the trial court's explanations, defense counsel stressed the significance of the

presumption of innocence standard during closing argument:

> Throughout these proceedings and at the beginning of this case, I know you heard this term, and you will hear it again. The first term is the presumption of innocence…Now, what that means is that these defendants before you, Jim Soto and David Ayala, are presumed innocent until the State proves them guilty by presenting enough evidence beyond a reasonable doubt. Now, that presumption lies with them throughout the entire trial…
>
> Now, the State has to prove their case beyond a reasonable doubt. The burden of proof—now, there is another legal term. The burden of proof is upon the State. What does that mean? Now, as Mr. Locallo said to you, the Defense doesn't have to prove anything. We need not present any evidence. The State must prove their case beyond a reasonable doubt.

(Dkt. 71-6, pg. 440-41.) Contrary to Petitioner's argument, the State did not undermine counsel's explanation of these principles in rebuttal argument. The Court acknowledges that the State argued the jurors must apply the same level of scrutiny to the defense's witnesses as they do to the prosecution's witnesses, but this argument appears to be in response to the defense's closing argument that Cruz's testimony was not credible—not an attempt to skew the presumption of innocence principle or related beyond a reasonable doubt standard. (Dkt. 71-6, pg. 430, 533-34.) In fact, the State acknowledged in rebuttal argument that Petitioner "doesn't have to prove a thing" and that the burden is on the State. *Id.* (quote on page 533).

The record clearly demonstrates that the presumption of innocence standard was repeatedly explained and emphasized to the jurors by both the trial court and by defense counsel. Additionally, as the appellate court observed, Petitioner's conviction was well supported by the testimony of Cruz, who drove Petitioner and his fellow assailants to the crime scene, observed them walk towards the park with weapons in hand, heard gunshots, and received their report upon their return to the getaway car that "someone might have been hit." *Direct Appeal*, 491 N.E.2d at 156-57. Although Petitioner contends Cruz's account is untrustworthy, the jury heard ample testimony regarding the possible motives for Cruz's testimony and rejected these theories. *See Hayes*, 403

36

F.3d at 938 ("testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar.").

In sum, it was reasonable for the state appellate court to conclude, in light of the totality of the circumstances, that the jurors understood the presumption of innocence standard and that the absence of a formal jury instruction on this principle did not deprive Petitioner of a fair trial. Petitioner's arguments to the contrary are insufficient to overcome AEDPA's high bar to obtain federal habeas corpus relief. *See Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)) ("The question under AEDPA is [] not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable— 'a substantially higher threshold' …"). Claim 1(b) is denied.

### 2. Claim 1(a): State's Burden of Proof

Petitioner further challenges the omission of a standalone instruction on the State's burden of proof of beyond a reasonable doubt. Like Claim 1(b), the state appellate court's decision on direct appeal is the operative decision, as that was the last state court to address the burden of proof instruction in a reasoned decision on the merits. *See Harris*, 698 F.3d at 623 (citations omitted). Here too, the state appellate court applied *Whorton*, holding the omission of the separate instruction on the burden of proof standard did not deprive Petitioner of a fair trial because the applicable standard was "adequately communicated to the jury by the trial court as well as the arguments of counsel." *Direct Appeal*, 491 N.E.2d at 156-57. Petitioner challenges the state court's

decision applying *Whorton*, arguing that the omission of a separate burden of proof instruction is a structural error. (Dkt. 158, pg. 27-31.)

    The Court notes at the outset that although there was no freestanding beyond a reasonable doubt jury instruction, the jury was repeatedly, and accurately, informed that it was the State's burden to prove Petitioner's guilt beyond a reasonable doubt during various parts of the trial. Prior to *voir dire*, the trial court explained the State's burden of proof. (Dkt. 71-22, pg. 130) ("The burden of proof is on the state to prove…defendant guilty beyond a reasonable doubt, and the burden never shifts.").[15] During the jury selection process, the trial court confirmed the jurors' understanding of their obligation should the State meet this burden:

> Q:    If after listening to all of the evidence you are convinced beyond a reasonable doubt that the Defendant is guilty as charged, what will be your verdict?
>
> …
>
> Q:    If after listening to all of the evidence you are not convinced beyond a reasonable doubt that the Defendant is guilty as charged, what will be your verdict?

(Dkt. 71-19, pg. 452-606) (repeated for each prospective juror). And as previously discussed, the trial court reiterated to all prospective jurors its earlier explanations of the presumption of innocence and burden of proof standards, stating (in addition to the principles cited above):

> Another rule of law is that the burden of proof is on the State to prove the Defendant guilty beyond a reasonable doubt, and the burden never shifts. Do you agree with that rule of law?

---

15 As noted above, the portion of the transcript that includes the trial court's explanation of the presumption of innocence and burden of proof principles is nearly illegible. (Dkt. 71-22, pg. 130). The Court, however, can decipher, based on the parts of the text that are legible, that the quoted explanation was given.

(Dkt. 71-19, pg. 454.) All prospective jurors confirmed their understanding of, and agreement with, these principles. *Id.* at 459.

Additionally, following the completion of the evidence at trial, the jury was given instructions that identified the elements of each crime charged and informed the jury that the State must prove all of the elements beyond a reasonable doubt:

> To sustain the charge of murder, the State must prove the following propositions:
>
> First: …
>
> Second: …
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty.
>
> …

(Dkt. 71-6, pg. 560 (conspiracy); pg. 562 (attempt); pg. 566-67 (murder)).[16]

---

16 Respondent's answer cites to the element instructions in support of his argument that the jury was properly instructed on the reasonable doubt standard. (Dkt. 172, pg. 9). Petitioner replies, for the first time in this litigation, that the elements instruction fails to correctly communicate to the jury that the burden is on the prosecution to prove the elements beyond a reasonable doubt. *See Patterson v. New York*, 432 U.S. 197, 210 (1977). Petitioner's argument is incorrect as the element instructions inform the jury that the prosecution must prove the elements of the crimes charged beyond a reasonable doubt.

Moreover, Petitioner's argument on this point shifts from the claim in his amended petition, which challenges the alleged lack of a jury instruction on beyond a reasonable doubt, (Dkt. 158, pg. 23-27), to one that argues, in the alternative, that in addition to the lack of a proper instruction, the instruction cited by Respondent provides a defective reasonable doubt standard. (Dkt. 182, pg. 6-7.) Petitioner adds citations to *Patterson*, and *Sullivan v. Louisiana*, 508 U.S. 275 (1993), in support of the defective jury instruction claim for the first time in the reply. *Id.*

The problem for Petitioner is that he never raised a defective instruction claim in his original or amended petition, and did not exhaust the claim before the state court. So, he is raising an untimely and defaulted defective instruction claim for the first time via a reply brief. That is certainly improper. A more favorable view to Petitioner is that he is not truly attempting to raise a new claim but instead is seeking to meet Respondent's argument in the answer. However, Petitioner's shift is an improper attempt to swap out one alleged impropriety (lack of jury instruction) for another (a defective instruction), which the Court finds unpersuasive. The focus of this claim is on the alleged lack of a proper formal jury instruction, not on the alleged deficiency in any of the instructions because that is the claim raised by Petitioner.

Despite these multiple instructions on the correct beyond-a-reasonable-doubt standard, Petitioner argues the lack of a standalone jury instruction on the burden of proof standard results in a structural error in this case.

The Court rejects Petitioner's argument that this claim should be reviewed *de novo*. Petitioner asserts that the state court erred in concluding that *Whorton* provided the applicable law for this claim. This is a "contrary to" argument under § 2254(d)(1). A state court ruling is "contrary to" clearly established federal law from the Supreme Court when the "state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *McNary v. Lemke*, 708 F.3d 905, 913 (7th Cir. 2013) (citation omitted) (explaining a "state court's decision is 'contrary to' federal law if it employs the wrong legal standard established by the Supreme Court."). "Where the state court's decision is 'contrary to' federal law, that decision is not entitled to the usual AEDPA deference and is therefore reviewed *de novo* with the reviewing court applying the correct legal standard." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012) (citing § 2254(d)(1)). A necessary condition of a "contrary to" finding is that there was clearly established federal law from the Supreme Court of the United States governing the claim at the time of the relevant state court decision. *Carey v. Musladin*, 549 U.S. 70, 74 (2006). However, as explained below when addressing the merits of Petitioner's claim, there was no clearly established federal law from the Supreme Court at the time of the relevant state court decision on this issue.

---

Finally, neither party cites to, nor discusses, the trial judge's instructions on the beyond the reasonable doubt standard during *voir dire*. And as mentioned above, the elements instructions do inform the jury that the prosecution has the burden of proof of beyond a reasonable doubt.

As such, Petitioner's argument for *de novo* review of this claim is incorrect, and so the traditional AEDPA deferential standard applies to this claim.

Moving to the merits of this claim, "[t]he government must prove beyond a reasonable doubt every element of a charged offense." *Victor v. Nebraska*, 511 U.S. 1, 5 (1995) (citing *Winship,* 397 U.S. 358). The beyond a reasonable doubt standard "plays a vital role in the American scheme of criminal procedure," *Winship*, 397 U.S. at 363, and it is a requirement of due process. *Victor*, 511 U.S. at 5.

"'[M]ost constitutional errors can be harmless.'" *Washington v. Recuenco*, 548 U.S. 212, 218 (2006) (citing *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Fulminante*, 499 U.S. at 306)). "[O]nly in a 'very limited class of cases,'" has the Supreme Court held that an error is structural and, thus, subject to automatic reversal. *Neder*, 527 U.S. at 8. These are "complete denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of the right of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction." *United States v. Warner*, 498 F.3d 666, 679 (7th Cir. 2007) (citing *Recuenco*, 548 U.S. at 218 n.2); *see also Neder*, 527 U.S. at 8.

The closest type of structural error to this case—a defective reasonable doubt instruction—comes from *Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), and *Sullivan v. Louisiana*, 508 U.S. 275 (1993). *Cage* holds that "a jury instruction is unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow conviction without proof beyond a reasonable doubt." *Tyler v. Cain*, 533 U.S. 656, 658 (2001). In turn, *Sullivan* holds the error in *Cage* is structural. *Tyler*, 533 U.S. at 665.

*Cage / Sullivan* are no help to Petitioner. *Cage* was decided in 1990, and *Sullivan* in 1993, while the relevant state court decision in this case was issued in 1986. *Direct Appeal*, 491 N.E.2d at 156-57. The state court opinion predating *Cage / Sullivan* deprives Petitioner of the benefit of those rulings in this case. *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (internal quotation marks and citations omitted) ("Under AEDPA too, state-court decisions are measured against this Court's precedents as of the time the state court renders its decision and cannot be held unreasonable only in light of later decided cases.").

Moreover, even if the Court could apply *Cage / Sullivan*, it would conclude they are unhelpful to Petitioner on the merits. *Cage* held that the jury instruction in that case violated due process because there was a reasonable likelihood that a juror could convict on a standard of proof less than what was required by the beyond a reasonable doubt standard. *Victor*, 511 U.S. at 5-6 (citing *Cage*, 498 U.S. at 40-41). Critically, unlike *Cage*, this is not a defective instruction case. The claim of error in this case is that the jurors did not receive a freestanding reasonable doubt instruction despite receiving instruction on the reasonable doubt standard during *voir dire* and during instructions on each offense's elements. (Dkt. 71-6, pg. 560, 562, 566-67) (as previously noted, when instructing jurors on the elements of conspiracy, attempt, and murder, the trial court stated: "If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the Defendant guilty"). *Cage / Sullivan* do not speak to whether a standalone instruction is required.

That this case presents a question in a related area of law to *Cage / Sullivan* is not enough. "The Justices insist that a principle be made concretely applicable to the problem at hand before it may be used on collateral review." *Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (en banc).

"Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" *White v. Woodall*, 572 U.S. 415, 426 (2014) (quoting *Yarborough*, 541 U.S. at 666). *Cage / Sullivan* are not clearly established law because they do not answer the issue presented by Petitioner's claim. *See Lopez v. Smith*, 574 U.S. 1, 6 (2014) (instructing that the AEDPA prevents lower courts from considering Supreme Court precedent at a "high level of generality," and clearly established federal law must address the "specific question presented by this case."); *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous. As the Ohio Court of Appeals' decision does not conflict with the reasoning or the holdings of our precedent, it is not 'contrary to ... clearly established Federal law.'"). To put a fine point on it, *Cage* holds that a defective reasonable doubt instruction violates the Constitution, and *Sullivan* holds the *Cage* error is structural, but again, this is not a defective instruction case. *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (per curiam) (reversing grant of habeas corpus when no Supreme Court decision "squarely addresses the issue in this case.").

The Court is mindful that "the lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from [the Supreme Court's] cases can supply such law." *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) (per curiam) (citing *Yarborough*, 541 U.S. at 664); *Long*, 874 F.3d at 549 ("We appreciate that, if a general proposition inevitably entails some concrete application, then there's no need to wait for the Justices to apply the principle in the inevitable way."). The instant case, however, does not involve a straightforward application of a well-established principle that the Supreme Court

has clearly established as governing a field of law – for example, how *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim regardless of the underlying factual allegations. To the contrary, to resolve the question presented by the instant claim, the Court would need to venture into uncharted legal territory making new law along the way. The AEDPA forbids this. *See, e.g., Van Patten*, 552 U.S. at 124 (recognizing that while *United States v. Cronic,* 466 U.S. 648 (1984), provides a general standard for claims where prejudice is presumed such as a complete denial of counsel, and *Strickland* equally provides a general standard for ineffective assistance of counsel claims, no case from the Supreme Court clearly established when *Cronic* should replace *Strickland* in the "novel factual context" of the defense attorney participating at a plea hearing via speakerphone).

The Court appreciates that the Supreme Court's more recent characterization of the *Cage / Sullivan* standard contains language more favorable to Petitioner despite the fact that the Justices have not heard a case directly addressing *Cage*. The following statements were in the portion of Supreme Court opinions discussing structural errors in general, but not addressing *Cage* nor the issue raised by the instant claim directly: *Greer v. United States*, 141 S. Ct. 2090, 2100 (2021) (quoting *United States v. Davila*, 569 U.S. 597, 611 (2013)) ("[S]tructural errors include . . . 'failure to convey to a jury that guilt must be proved beyond a reasonable doubt.'"); *McCoy v. Louisiana*, 138 S. Ct. 1500, 1511 (2018) (recognizing as a structural error "a judge's failure to tell the jury that it may not convict unless it finds the defendant's guilt beyond a reasonable doubt"); *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017) (explaining that a structural error results in "fundamental unfairness" such as "the judge fails to give a reasonable-doubt instruction."). This language stands in contrast to the facts of *Cage* as a defective-instruction case, and the Supreme

Court's older characterization of the *Cage / Sullivan* standard, again in cases that set forth the standard in a general discussion of structural error: *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 (2006) (instructing that structural error includes "the denial of the right to trial by jury by the giving of a defective reasonable-doubt instruction."); *Neder*, 527 U.S. at 8 ("defective reasonable-doubt instruction"); *Johnson v. United States*, 520 U.S. 461, 469 (1997) ("erroneous reasonable-doubt instruction to jury").

Regardless of whether this more recent language suggests the Justices are willing to expand *Cage / Sullivan* beyond its factual context or is an unintentional drift from the original moorings due to the use of imprecise language, the question is beyond the scope of this Court's purview under the AEDPA. As mentioned above, the Court's evaluation is of the clearly established law from the Supreme Court at the time of the relevant state court decision, not subsequent developments. *Brown*, 142 S. Ct. at 1525. The Court is also limited to the holdings, not dicta, of Supreme Court decisions. *Id*.; *see also Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) (explaining that the Supreme Court is less likely to have created "clearly established" law when its "precedents in [an] area have not been a model of clarity.") What is clear is that there is no holding from the Supreme Court extending *Cage / Sullivan's* structural error beyond a defective instruction, and there was certainly no holding on that point at the time of the relevant state court decision in Petitioner's case in 1986.[17] The lack of clearly established law dooms Petitioner's claim.

---

17 For argument purposes, even if the Court could apply *Cage / Sullivan de novo*, taking the case out of the AEDPA's "clearly established federal law" requirement as Petitioner seeks, *Mosley*, 689 F.3d at 844, *Cage / Sullivan* would still be no help to Petitioner due to *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion). *See Greene*, 565 U.S. at 39 (explaining that the "AEDPA did not codify *Teague*," they are distinct inquiries). *Teague* requires this Court to "apply the law [even with structural errors] as it was when the state's process ended, not the law as it is when the federal judiciary turns to the subject," unless the law is retroactive under *Teague*. *Rodriguez v. Chandler*, 492 F.3d 863, 865 (7th Cir. 2007); *see also Tyler*, 533 U.S. at 666. *Cage* is a new rule for purposes of *Teague*. *See Lewis v. United States*, 985 F.3d 1153, 1159 (9th Cir. 2021); *Williams v. Cain*, 229 F.3d 468, 472 (5th Cir. 2000); *Tilman v. Cook*, 215 F.3d 1116, 1122 (10th Cir. 2000); *Adams v. Aiken*, 41 F.3d 175, 178 (4th Cir. 1994); *see also Victor*, 511 U.S. at 5 (citing

Although *Cage / Sullivan* are the leading cases on structural error relating to a reasonable doubt jury instruction, Petitioner does not invoke them, instead arguing that the state court decision is contrary to *In re Winship*, 397 U.S. 358 (1970), *Jackson v. Virginia*, 443 U.S. 307 (1979), and *Victor v. Nebraska*, 511 U.S. 1 (1994). (Dkt. 158, pg. 23.) Alternatively, Petitioner argues the state court ruling is an unreasonable application of *Whorton*. (Dkt. 158, pg. 23.)

---

*Cage*, 498 U.S. at 40) ("In only one case [*Cage*] have we held that a definition of reasonable doubt violated the Due Process Clause."). The *Teague* retroactivity exception relevant for *Cage* is a watershed rule of criminal procedure implicating fundamental fairness and the accuracy of the criminal proceeding. *Tyler*, 533 U.S. at 665. *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021), clarified the *Teague* standard, holding that "[n]ew procedural rules do not apply retroactively on federal collateral rule." In sum, regardless of whether this claim is adjudicated under the AEDPA's deferential standard or *Teague*, Petitioner cannot receive the benefit of *Cage / Sullivan* because it was not clearly established federal law at the time of the state court ruling (AEDPA), nor does it apply retroactively (*Teague* modified by *Edwards*).

Finally, even if Petitioner could overcome both the AEDPA and *Teague*, and extend *Cage / Sullivan* from a defective instruction case to the factual issue of this case, the Court would still conclude that there was no *Cage* error. When evaluating a *Cage* claim, the Court must consider whether the trial court's instructions, "'taken as a whole," "must correctly convey the concept of reasonable doubt to the jury." *Victor*, 511 U.S. at 5 (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)) (internal quotation marks omitted). The requirement to view the instructions "as a whole" undermines Petitioner's focus on the lack of a freestanding beyond a reasonable doubt instruction. *See Perry v. Johnson*, 532 U.S. 782, 800 (2001) (quoting *Boyde v. California*, 494 U.S. 370, 381 (1990)) ("[W]e will approach jury instructions in the same way a jury would --- with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'")

The Court appreciates that the beyond a reasonable doubt standard was communicated to the jurors during *voir dire* and then later reinforced by the elements jury instructions. Although "a criminal trial does not commence for purposes of the Double Jeopardy Clause until the jury is empaneled and sworn," "*voir dire* represents jurors first introduction to the substantive factual and legal issues in a case." *Gomez v. United States*, 490 U.S. 858, 872, 874 (1989). It is important enough that errors during *voir dire* can be grounds for reversal of a conviction, *id.* at 876, including a structural error under *Batson v. Kentucky*, 476 U.S. 79 (1986). There is no question the jurors in this case were instructed on the correct beyond a reasonable doubt standard in *voir dire* and the elements jury instructions tendered to the jury at the completion of the evidence reenforced that standard. "Viewed holistically," as required, the Court "cannot see how the [empaneled] jury could misunderstand the government's burden of proof." *United States v. Eaden*, 37 F.4th 1307, 1312 (7th Cir. 2022); *see also Victor*, 511 U.S. at 5. The record conclusively demonstrates the jurors who found Petitioner guilty were admonished on the correct beyond a reasonable doubt standard. Although the method through which they received this correct standard is certainly not best trial practice, particularly when the formal jury instruction on the presumption of innocence and reasonable doubt standards is required to be given in all Illinois criminal cases, *see* Ill. Pattern Jury Instr.-Criminal 2.03, that shortcoming does not entitle Petitioner to habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("In arguing his point, McGuire makes much of the fact that, in giving its instruction, the trial court deviated in part from standard jury instruction 2.50, 1 California Jury Instructions, Criminal (4th ed. 1979) (CALJIC). As we have stated above, however, the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief.").

Before turning to these cases, the Court notes that *Victor* was decided after the relevant state court decision in 1986. *Direct Appeal*, 491 N.E.2d at 156-57. This places *Victor* out of bounds as it is not clearly established federal law from the Supreme Court at the time of the relevant decision, *Brown*, 142 S. Ct. at 1525, and as discussed below, even if it could be considered, it would not be helpful to Petitioner. With that limitation in place, the Court examines *Winship*, *Whorton*, and *Jackson*, along with related cases of *Cool v. United States*, 409 U.S. 100 (1972) (per curiam), and *Taylor v. Kentucky*, 436 U.S. 478 (1978).

*Winship* holds that the "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. Prior to *Winship*, the Supreme Court presumed the beyond a reasonable doubt standard was constitutionally required, but had not explicitly held. *Id.* at 362. *Winship* establishes the beyond a reasonable doubt principle as a constitutional standard, but it is silent to the issues of this case of whether a freestanding beyond a reasonable doubt instruction is required when the jury receives the standard via other instructions, or whether the alleged failure is structural error. *Id.* at 359 ("This case presents the single, narrow question whether proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult."); *Id.* at 364 ("Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). There is no doubt that the jury was informed of the *Winship* standard in Petitioner's case. His challenge, instead, focuses on the method by

47

which the jury was informed of the *Winship* standard, but *Winship* does not speak to that issue. *Winship* does not constitute clearly established federal law under the AEDPA for the issues in this claim. *Lopez*, 574 U.S. at 6; *White*, 572 U.S. at 426; *Long*, 874 F.3d at 549.

Next is *Cool v. United States*, 409 U.S. 100 (1972) (per curiam). The Court considers *Cool* because it is cited in Footnote 14 of *Jackson v. Virginia*, 443 U.S. 307, 320 n.14 (1979), which Petitioner relies upon in his argument. The lower court in *Cool* ruled that a jury may be instructed to ignore defense testimony unless it believes beyond a reasonable doubt that the testimony is true. *Id*. at 100. The Supreme Court found this instruction failed to comply with the beyond a reasonable doubt standard of *Winship* because the instruction had a substantial effect on reducing the government's burden of proof below what is constitutionally required. *Id*. at 104; *see Gilmore v. Taylor*, 508 U.S. 333, 344 n.2 (1993) (explaining that *Cool* is a "progeny of *Winship*" because the defective instruction found unconstitutional in *Cool* violated *Winship's* proof beyond a reasonable doubt standard).

Although *Cool* is not mentioned in *Cage*, *Cool* may be best understood as a forerunner of *Cage* because they both involve defective jury instructions that did not comply with the beyond a reasonable doubt standard of *Winship*. *Cage*, 498 U.S. at 41 ("It is our view, however, that the instruction at issue was contrary to the "beyond a reasonable doubt" requirement articulated in *Winship*. . . . [I]t becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."); *Cool*, 409 U.S. at 104 ("[T]he instruction also has the effect of substantially reducing the Government's burden of proof. We held in *Winship*, that the Constitution requires proof of guilt beyond a reasonable doubt. . . . [T]he effect of the judge's instructions is to require the defendant

48

to establish his innocence beyond a reasonable doubt."); *see also United States ex rel. Ayala v. Washington*, No. 97 C 2864, 1997 WL 627648, at *4 (N.D. Ill. Sept. 30, 1997) ("[T]he trial court in *Cool* affirmatively misled the jury about the government's burden of proof.").[18] Like the above discussion of *Cage / Sullivan*, this is not a defective-instruction case meaning *Cool* does not constitute clearly established federal law under the AEDPA for purposes of the issue presented in this claim. *Lopez*, 574 U.S. at 6; *White*, 572 U.S. at 426; *Long*, 874 F.3d at 549.

On deck are *Taylor v. Kentucky*, 436 U.S. 478 (1978), and its follow up case, *Kentucky v. Whorton*, 441 U.S. 786 (1979) (per curiam). Like *Cool*, the Court discusses *Taylor* (and its clarifying case, *Whorton*) because *Taylor* is cited in Footnote 14 of *Jackson*. *Taylor* held that a trial court's refusal to give a requested instruction on the presumption of innocence resulted in a violation of the due process right to a fair trial. 436 U.S. at 490. Although *Taylor* ordered reversal of the conviction, it made clear that it was limiting its holding to the facts of that case, *id.*, a point that *Whorton* reinforced when it held that a presumption of innocence instruction is not constitutionally required in all trials, and the failure to provide the instruction is not structural error.[19] 441 U.S. at 787. Instead, as discussed above, the failure to provide the presumption of

---

[18] That *Cage* can be read as consistent with *Cool* does not undermine the fact that *Cage* is a new rule under *Teague*. "A rule is new unless it was '*dictated* by precedent existing at the time the defendant's conviction became final." *Edwards*, 141 S. Ct. at 1555 (citing *Teague*, 489 U.S. at 301) (emphasis in original). Although *Cool* and *Cage* are both a faithful application of *Winship* in that a jury instruction cannot improperly alter the beyond a reasonable doubt standard, *Cage* is a new rule as it was the first time this principle was applied to an improper beyond a reasonable doubt instruction. *Tyler*, 533 U.S. at 665; *Victor*, 511 U.S. at 5; *Tillman*, 215 F.3d at 1122. In contrast, *Cool* involved the jury instruction on the treatment of the defendant's testimony. 409 U.S. at 100, 104.

[19] Although the phrase "structural error" had not entered into the Supreme Court's lexicon at the time of the *Whorton* decision, the Justices had recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be as harmless error . . ." *Chapman v. California*, 386 U.S. 18, 23 & n.8 (1967). The dichotomy between trial errors amendable to harmless error, and "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards" was first established by *Fulminante*, 499 U.S. at 309. The phrase "structural error" replaced "structural defect" beginning in *Sullivan*, 508 U.S. at 282, and has been used by the Supreme Court ever since. There is no dispute that *Whorton* falls on the "harmless error" side of the harmless error / structural error dichotomy. *Fulminante*, 499 U.S. at 307 (recognizing *Whorton* as a harmless error standard).

innocence instruction must be evaluated under the totality of the circumstances including all jury instructions, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors to determine if the defendant received a constitutionally fair trial. *Id*. at 789.

With this understanding of *Winship*, *Cool*, and *Taylor*, the Court turns to *Jackson*. Although the Court concludes that *Jackson* is not clearly established federal law regarding the specific claim in this case, the Court recognizes that there is language in *Jackson* that can be read as helpful to Petitioner's cause. However, this language must be read within the context of *Jackson's* holding as the Court is limited to the holdings, not dicta, of Supreme Court decisions. *Brown*, 142 S. Ct. at 1525. In this proper context, the Court concludes that *Jackson* does not provide clearly established federal law applicable to the instant claim.

*Jackson* is a continuation from *Winship*. 443 U.S. at 309. While *Winship* established that proof beyond a reasonable doubt is constitutionally required, *Jackson* provides the familiar standard for reviewing the sufficiency of the evidence supporting a conviction of "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original). *Jackson* rejected the "no evidence" standard from *Thompson v. Louisville*, 362, U.S. 199 (1960), that had been used by the lower court in that case to review the sufficiency of the evidence. *Id*. at 309, 312, 314-15. The "no evidence" standard of *Thompson* held "that a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm." *Jackson*, 443 U.S. at 314. *Jackson* instructs that the rational trier of fact standard must be used to comply with *Winship*. *Id*. at 319-20.

50

*Jackson* is unhelpful to Petitioner. The clearly established federal law coming from *Jackson* is the proper standard for evaluating a sufficiency of the evidence challenge. Importantly, the instant issue raised by Petitioner is not challenging the sufficiency of the evidence supporting his conviction. *Jackson* does not speak to the issues of this case of whether the instructions in this case are sufficient, and if not, is the alleged error structural. *Jackson* does not constitute clearly established federal law under the AEDPA for this issue. *Lopez*, 574 U.S. at 6; *White*, 572 U.S. at 426; *Long*, 874 F.3d at 549.

Although not part of the holding, the Court recognizes there is language in *Jackson* suggesting that *Winship* provides a right to a properly instructed jury, and failure to provide the proper instruction is structural error. 443 U.S. at 318 ("After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."); 443 U.S. at 320 n.14 ("Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error. *See Cool v. United States*, 409 U.S. 100 (1972). *Cf. Taylor v. Kentucky*, 436 U.S. 478 (1978).").

The Court concludes this language is best understood as expressing that the jury must be instructed on the correct substantive standard under *Winship*, but it does not speak to the specific procedural method for providing the instruction. The citations to *Cool* and *Taylor* are instructive on this point. *Cool* involved a defective instruction that did not meet the beyond a reasonable doubt standard, and *Taylor* was the failure to provide any instruction on the presumption of innocence. *Cool* and *Taylor* speak to the substantive standard, not how the jury must be informed of the correct

standard. As discussed above, the jury in this case was properly instructed from a substantive

perspective; the dispute in this case is over the procedure of how the jurors were instructed due to

the lack of a freestanding reasonable doubt instruction.

The Court is unaware of any ruling from the Supreme Court, and certainly there is nothing

in the holding of *Jackson*, mandating a specific procedure of how the jurors must be instructed on

the reasonable doubt standard, meaning there is no clearly established law supporting Petitioner's

argument. It should be remembered that the Justices know how to mandate specific procedures

when they conclude it is constitutionally required, *cf. Miranda v. Arizona*, 384 U.S. 436, 444

(1966) (establishing *Miranda* warnings); *see also Dickerson v. United States*, 530 U.S. 428, 439

(2000) (recognizing *Miranda* established constitutional procedures for law enforcement agencies

and the courts to follow), but they have not done so in this area of law.

In fact, when the Justices have had an occasion to discuss procedural issues in this area of

law, they have declined to impose specific requirements. For example, in *Victor*, the Supreme

Court considered attempts by lower courts to define the beyond a reasonable doubt standard. 511

U.S. at 5. Declining to define the term, the Supreme Court took a hands-off approach holding that

the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to

do so as a matter of course. *Id. Victor* instructs, "[i]ndeed, so long as the court instructs the jury on

the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does

not require that any particular form of words be used in advising the jury of the government's

burden of proof." *Id.* (citing *Jackson*, 443 U.S. at 320 n.14; *Taylor*, 436 U.S. at 485-86). The first

part of this sentence explaining that the jury must be instructed on the proof beyond a reasonable

doubt standard is drawn directly from Footnote 14 of *Jackson*. That this first part of the sentence

52

is set against the second part explaining there is no "particular form of words" reenforces the Court's understanding that Footnote 14 of *Jackson* speaks to the substantive requirement, and the Justices have refrained from imposing a specific procedural requirement. This is further demonstrated by the next sentence of *Victor* which explains, "[r]ather, 'taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.'" 511 U.S. at 5 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The Supreme Court's case law demonstrates that a trial court is not required to use any particular words or procedure as long as the correct *Winship* standard is communicated to the jury.

Petitioner's emphasis on Footnote 14 of *Jackson* stands in contrast to the Supreme Court's relegation of the footnote over the past three decades. Footnote 14 of *Jackson's* last appearance in a Supreme Court case was *Victor* in 1994. 511 U.S. at 5. Since then, the Supreme Court has enumerated examples of structural errors on numerous occasions, but only *Cage / Sullivan*, not Footnote 14 of *Jackson* (nor *Cool*), has been identified as a source of structural error in this area of law. *Greer*, 141 S. Ct. at 2100; *McCoy*, 138 S. Ct. at 1511; *Weaver*, 137 S. Ct. at 1908; *Davila*, 569 U.S. at 611; *Gonzalez-Lopez*, 548 U.S. at 149; *Neder*, 527 U.S. at 8; *Johnson*, 520 U.S. at 469.

Petitioner's argument that Footnote 14 of *Jackson* is a source of structural error would imply that it is an ancient artifact inadvertently forgotten by the Justices. Although there are famous footnotes in the law, *see, e.g.*, *United States v. Carolene Prod. Co.*, 304 U.S. 144, 152 n.4 (1938), the Supreme Court has said nothing to suggest Footnote 14 of *Jackson* is of the same sort.[20]  If Footnote 14 of *Jackson* is a groundbreaking, but forgotten, source of a structural error as Petitioner

---

20  Moreover, if *Winship* and *Jackson* can be read to establish a structural error holding as Petitioner claims, then why would the Justices have made the effort to decide *Cage* and *Sullivan* in the first place if *Winship* and *Jackson* long ago settled the issue? And why have the Justices never told us that *Winship* and *Jackson* together create a structural error holding beyond *Cage* and *Sullivan* over the last three decades since *Cage* and *Sullivan*?

argues, it is for the Justices to say so in clear terms. *See Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1333 (11th Cir. 2016) (quoting *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001)) ("And just as Congress does not generally 'hide elephants in mouseholes,' the Supreme Court does not hide clearly established federal law . . . .").

Petitioner also cites to a number of court opinions that set forth the standard from Footnote 14 of *Jackson* including Justice White's dissenting opinion in *Fulminante*, 499 U.S. at 291, *Cole v. Young*, 817 F.2d 412, 427 (7th Cir. 1987), and other lower federal court and state court decisions. (Dkt. 158, pg. 25.) Under the AEDPA, lower court rulings cannot be used to go beyond the clearly established law announced by the Supreme Court. *Marshall*, 569 U.S. at 64 (instructing that circuit precedent cannot be used to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced."). These lower court opinions may only be considered to the extent that they set forth Footnote 14 of *Jackson*, but as explained above, the principles from that footnote do not help Petitioner. Equally, that the trial court did not allegedly comply with the requirements of the Illinois Pattern Jury Instructions or Illinois case law is of no moment as the Court is restricted to Supreme Court holdings in existence at the time of the state court decision. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'").

Finally, Petitioner challenges the state court's application of *Whorton* as an alternative argument. Should that argument be considered relevant, it would still be meritless. The state appellate court's harmless-error analysis is not an unreasonable application of *Whorton*. As explained above, the jurors were repeatedly informed of the State's burden to prove Petitioner's

guilt beyond a reasonable doubt. The jurors heard the trial court's explanation of this principle

before *voir dire*, confirmed their understanding and agreement to this principle during the jury

selection process, and were again reminded of the beyond a reasonable doubt standard and their

obligation if the State met this burden before deliberations when the trial court instructed them on

the elements of each charge. In light of the totality of the circumstances, there can be no question

that the jurors were correctly informed of the beyond a reasonable doubt standard. *Whorton*, 441

U.S. at 789. Claim 1(a) is denied.

### B.      Claim 3:   Padilla's Alleged Perjury

Turning to Claim 3, Petitioner argues his due process rights were violated where the State

allegedly intimidated Padilla into giving false testimony that he did not see the shooters on the

night of the murders. (Dkt. 158, pg. 45-49.) Petitioner's claim is predicated on an affidavit executed

by Padilla six years after the murders wherein Padilla alleges that he told prosecutors that he saw

the shooters' faces but was threatened to not reveal this information at trial. (Dkt. 71-13, pg. 61.)

Petitioner contends that the prosecution's failure to disclose Padilla's statement to the defense and

failure to correct his false testimony at trial constitutes a violation of *Napue v. Illinois*, 360 U.S.

264 (1959), *Brady v. Maryland*, 373 U.S. 83 (1963), and their progeny.[21] (Dkt 158, pg. 45-49.)

The last state court to address the merits of the Padilla-false-testimony claim was the state

appellate court on Petitioner's 2013 post-conviction appeal. *2013 Post-Conviction Appeal*,

¶¶ 22-27. The state appellate court's decision is thus the operative decision for this Court's review.

---

21 One could question whether Petitioner exhausted Claim 3, as his 2013 post-conviction appeal and post-conviction
PLA, where Respondent appears to believe Petitioner completed the exhaustion of this issue, challenge the proper
standard used to evaluate Padilla's affidavit under Illinois' Post-Conviction Hearing Act, an apparent issue of state
law. (Dkt. 71-1, pg. 20-23; Dkt. 71-2, pg. 22-27.) The Court, however, will not explore the exhaustion question as to
Claim 3 further because procedural default is an affirmative defense subject to forfeiture. *Cheeks v. Gaetz*, 571 F.3d
680, 686 (7th Cir. 2009) (internal quotation marks and citations omitted).

*See Stitts v. Wilson,* 713 F.3d 887, 891 (7th Cir. 2013) (internal quotation marks and citations omitted) ("When a state collateral review system issues multiple decisions, we typically consider the last reasoned opinion on the claim ... [u]nless [that] state-court opinion adopts or incorporates the reasoning of a prior opinion....").

A prosecutor has "'a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath.'" *Long*, 874 F.3d at 547 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Napue*, 360 U.S. at 269-72)). A defendant's "due-process rights are violated when the government obtains a conviction through the knowing use of false testimony." *United States v. Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017) (citing *Napue*, 360 U.S. at 269). "Under *Napue*, a petitioner must show that: 1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury." *Ashburn v. Korte*, 761 F.3d 741, 757 (7th Cir. 2014) (internal quotation marks and citation omitted).

In rejecting Petitioner's claim on post-conviction appeal, the state court did not cite to any federal precedent. However, contrary to Petitioner's argument, the state court's failure to do so is of no consequence, as the state court need not cite to, or even be aware of, the relevant federal cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see also Woods*, 575 U.S. at 316 (citation omitted) ("AEDPA's requirements reflect a 'presumption that state courts know and follow the law.'"); *Long*, 874 F.3d at 547 (citation omitted) ("[I]t does not matter whether a state court discusses federal precedent; § 2254(d)(1) applies whenever the state court makes a decision on the merits, no matter what the state judiciary says."). Instead, the state appellate court determined

56

Petitioner's false testimony claim failed at the outset based on the statements Padilla made shortly after the shooting that were consistent with his trial testimony that he could not identify his assailants. *2013 Post-Conviction Appeal*, ¶ 24. The state appellate court concluded Padilla's claims were "little more than a recantation of his trial testimony," and thus "inherently unreliable." *Id.* at ¶ 25.

Petitioner's argument focuses on AEDPA's second prong—that the state court's decision was based on an unreasonable determination of fact—arguing that the state court engaged in premature credibility determinations and that its conclusion that Padilla's affidavit was an untrue recantation was unreasonable. (Dkt. 158, pg. 48-49.) As discussed above, a state court decision rests on an unreasonable factual determination when "the state court determined an underlying factual issue against the clear and convincing weight of the evidence." *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011). "A decision is not objectively unreasonable unless it falls 'well outside the boundaries of permissible differences of opinion.'" *Starkweather v. Smith*, 574 F.3d 399, 402 (7th Cir. 2009) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)). "This is a difficult standard to meet, and 'that is because it was meant to be.'" *Cal v. Garnett*, 991 F.3d 843, 850 (7th Cir. 2021) (quoting *Harrington*, 5623 U.S. at 102). "'It bears repeating that even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable.'" *Id.* (quoting *Harrington*, 5623 U.S. at 102).

Petitioner fails to rebut, by clear and convincing evidence, the state appellate court's determination that Padilla's affidavit was nothing more than an unreliable recantation of his trial testimony. First, Padilla was interviewed by the police directly following the shooting and stated: he was a member of the Latin Kings; there were several people in the park at the time of the

shooting; he was shot in the buttocks; and he did not know who did the shooting. (Dkt. 71-12, pg. 34.) Six years later, Padilla came forward with a different version of events, claiming he could identify the shooters but was allegedly threatened by prosecutors in September 1982 to not reveal this information at trial. (Dkt. 71-13, pg. 61.) However, as the state appellate court observed, his statement to the police was taken on the night of the shooting in August 1981—long before the prosecution ever became involved in the case and could have had the opportunity to influence Padilla's testimony as he alleges in his affidavit. *2013 Post-Conviction Appeal*, ¶ 24. Additionally, given Padilla's gang affiliation, there would be little motive for him to cover up the identities of his assailants who were members of a rival gang.

Second, Padilla's injuries corroborate both his statement to the police and his testimony that he could not see the shooters. Specifically, Padilla testified that he had been at the park for approximately 30 minutes before the shooting started and at all times was facing north towards 31st Street. (Dkt. 71-20, pg. 355-56.) The shots came from Keeler Avenue to the east of Pietrowski Park. *Id.* at 341-42. When Padilla heard the shots, he dropped down and crawled toward the inside of the park—away from the sound of the gunfire. *Id.* at 343. Indeed, Padilla testified that he had crawled far enough into the park that nobody noticed he had been shot. *Id.* at 344. His positioning away from the direction of the shooters is further corroborated by the location of his gunshot wound—the lower, right buttocks. *Id.* at 343. Thus, Padilla's non-identification at trial was not only consistent with his earlier statement, but also supported by the physical evidence.

Finally, Padilla did not come forward with his new version of the truth until six years after the shooting. (Dkt. 71-13, pg. 61.) It was thus reasonable for the state appellate court to be suspect of Padilla's "eleventh hour" affidavit with no reasonable explanation for the delay. *See McDowell*,

737 F.3d at 484; *see also Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) ("Disbelief of recantations is sensible.") Beyond the unexplained delay, there is also no explanation for the different identifications in each of Padilla's affidavits provided in the record. While Padilla claims Wally Cruz and John Rojas were the shooters in one affidavit, (Dkt. 71-15, pg. 29), he includes a handwritten notation identifying Victor Rodriguez in another. (Dkt. 71-13, pg. 61.) This discrepancy further undermines the reliability of Padilla's allegations.

In sum, Petitioner cannot satisfy AEDPA's "stringent standard" under § 2254(d)(2). *Morgan*, 662 F.3d at 799. Given the evidence demonstrating that (1) Padilla was shot in the lower back as he crawled away from the shooters, (2) spoke with police following the shooting and could not identify his assailants, and (3) testified consistently with the information he first gave to police at trial, the state appellate court's rejection of Padilla's affidavit and, by extension, Petitioner's perjured testimony claim, was not an unreasonable determination of fact. Claim 3 is denied.

Nor is Petitioner entitled to an evidentiary hearing on this claim. Where, as here, the state court adjudicated the claim on the merits, the Court's review of the claim under the AEDPA "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181-82. Only if Petitioner can overcome the limitations of § 2254(d) may the Court consider whether to accept new evidence. *See Westray v. Brookhart*, 35 F.4th 737, 754 (7th Cir. 2022) ("no federal evidentiary hearing is permitted when the state court has already addressed the issue," and its adjudication was reasonable under § 2254(d)); *Stechauner v. Smith*, 852 F.3d 708, 722 (7th Cir. 2017) (quoting *Mosley*, 689 F.3d at 844) (citing *Pinholster*, 563 U.S. at 205-06) (Breyer, J., concurring in part and dissenting in part)) (emphasis added) (only "'[i]f § 2254(d) *does not* bar relief, then an evidentiary hearing may be needed.'"). This approach

comports with "AEDPA's goal of promoting comity, finality, and federalism by giving state courts the first opportunity to review [a] claim, and to correct any constitutional violation in the first instance." *Pinholster*, 563 U.S. at 185 (citation omitted). And as the Supreme Court recently reiterated: "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States. … Thus, [t]he States possess primary authority for defining and enforcing the criminal law, … and for adjudicating constitutional challenges to state convictions." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1730-31 (2022) (internal quotation marks and citations omitted).

Accordingly, because the state appellate court decided the merits of Petitioner's false testimony claim, and because that determination was reasonable, the Court denies his request to conduct an evidentiary hearing to receive additional evidence not presented to the state court. *See Westray*, 36 F.4th at 754. Claim 3 is denied.

## V. Certificate of Appealability

Under the AEDPA, a certificate of appealability "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). This requires Petitioner demonstrate that reasonable jurists could debate whether this Court should have resolved Petitioner's claims differently or that the issues were "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack,* 529 U.S. at 484) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)).

Whether a standalone beyond-a-reasonable doubt instruction is required and whether its absence is structural error, given the Supreme Court's discussion of related issues, appear to

deserve encouragement to proceed further. The Court grants a certificate of appealability as to Claim 1(a). *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing *Slack*, 529 U.S. at 484-85; *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003)) ("To receive certification under § 2253(c), the prisoner must show that reasonable jurists would find the district court's assessment of the constitutional claim and any antecedent procedural rulings debatable or wrong."). The certificate of appealability is limited to this single issue. The Court declines to issue a certificate of appealability on any other issue as Petitioner cannot make the requisite showing for his other claims.

## CONCLUSION

Petitioner's second amended habeas corpus petition (Dkt. 158) is denied on the merits. Claims 1, 2, 3, and 4 are denied on the merits, and Claim 5 is voluntarily dismissed by Petitioner. Any other pending motions are denied as moot. The Court grants a certificate of appealability as to Claim 1(a) on the single issue of whether there is clearly established federal law from the Supreme Court of the United States holding that a trial court's failure to give a freestanding jury instruction explaining that the prosecution's burden of proof is beyond a reasonable doubt results in a structural error when the trial court instructed the jurors on the beyond a reasonable doubt standard during *voir dire*, and the standard is referenced in other jury instructions. The Court declines to issue a certificate of appealability on any other claim. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

ENTERED:

Dated: January 5, 2023

_____
THOMAS M. DURKIN
United States District Judge

61